Richard B. NELLIS, et al., Plaintiffs,

v.

AIR LINE PILOTS ASSOCIATION, et al., Defendants.

Civ. No. 92–771–A.

United States District Court, E.D. Virginia, Alexandria Division.

March 3, 1993.

Graeme W. Bush, James Sottile, IV, Caplin & Drysdale, Chartered, Washington, DC, for plaintiffs.

James L. Linsey, Cohen, Weiss and Simon (Michael E. Abram, Stephen Presser, Russell Hollander, Joseph J. Vitale, Dominique T. Bravo, on brief), New York City, Harvey B. Cohen, Cohen, Gettings, Dunham & Harrison, Arlington, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This class action labor dispute grew out of the widely-lamented demise of Eastern Airlines, Inc. ("Eastern"). More specifically, the case involves an allegation by former Eastern pilots that their union failed to represent their interests fairly during the breakup of Eastern and the subsequent sale of its assets to other airlines. Resolution of defendants' motion for summary judgment requires the Court to address novel questions concerning the scope of the federal duty of fair representation.

### I.

The class action is brought by nine named plaintiffs on behalf of themselves and a class of over 2,400 former pilots of Eastern. The class consists of all pilots on the Eastern seniority list as of March 4, 1989, who went on strike on that date and remained on strike until the end of the strike on November 22, 1989. The defendants are the Air Line Pilots Association, International ("ALPA" or the "Union") and ten of its former and present officials.

ALPA was, at all times relevant to this action, the authorized bargaining representative of the plaintiffs. ALPA is a national labor organization which represents airline pilots at over thirty airlines. It is a unitary labor organization, with a single Constitution and By–Laws governing all subordinate bodies and members. At each of the operating

airlines employing ALPA members, ALPA has a Master Executive Council ("MEC") composed of representatives elected from the airline's pilot employees. An MEC functions as the coordinating council for the ALPA-represented employees at each airline. At the national level, ALPA is governed by a Board of Directors, an Executive Board, and an Executive Committee, in descending order of authority.

On March 4, 1989, the Eastern pilots went on strike against Eastern. Plaintiffs allege that, prior to and at the time the Eastern pilots were considering whether to go on strike, ALPA promised that if the strike forced Eastern to curtail its operations and dispose of all or part of its assets, ALPA would strive to obtain jobs for the striking pilots, with no resulting loss in seniority, at whatever carrier or carriers eventually acquired the Eastern assets. Plaintiffs contend that ALPA later reneged on this obligation, and that ALPA's failure to negotiate on their behalf constituted a breach of the duty of fair representation imposed by federal law.

Five days after the commencement of the strike, Eastern filed a petition in the United States Bankruptcy Court for the Southern District of New York pursuant to Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101, *et seq.* From that time until January 18, 1991, Eastern continued to operate under the supervision of the bankruptcy court. During this period, with the approval of the bankruptcy court, Eastern leased and sold various assets to several other carriers. In July 1989, the bankruptcy court approved Eastern's proposal to sublease fourteen B–727 aircraft to Pan American World Airways, Inc. ("Pan Am"). In October 1989, the court approved Eastern's plan to transfer sixteen DC–9 aircraft and several international routes to Midway Airlines, Inc. ("Midway").

In addition, in May 1989, USAir, Inc. ("USAir") made a written offer to purchase fifteen B–757 aircraft and several gates, takeoff/landing slots, and international routes from Eastern. This transaction was never consummated.[1]

Meanwhile, the Eastern pilots ended their strike on November 22, 1989. On January 18, 1991, Eastern ceased all operations and has since been in the process of liquidating its remaining assets. In early February 1991, the Bankruptcy Court for the Southern District of New York held an auction to sell Eastern assets. At the auction, Delta Air Lines, Inc. ("Delta") purchased ten L–1011 aircraft, three international routes and several gates and takeoff/landing slots; United Air Lines, Inc. ("United") purchased 21 slots and three gates at Chicago's O'Hare International Airport; Northwest Airlines, Inc. ("Northwest") purchased sixty-seven slots and ten gates at Washington's National Airport; and USAir purchased six slots at Laguardia Airport and two of Eastern's Canadian routes.[2] Most of the Eastern estate was either sold to non-ALPA carriers such as Continental or American Airlines, or repossessed by Eastern's creditors. Eastern did not require any airline to hire Eastern pilots with lateral seniority as a condition of purchasing Eastern assets in the February 1991 auction.

In all of these transactions, both prior to and after Eastern ceased operations, plaintiffs contend that ALPA either failed to negotiate on their behalf for jobs with lateral seniority rights or worse, actively obstructed plans to hire plaintiffs to jobs with lateral seniority. Plaintiffs argue that there were two sources of ALPA's obligation to negotiate on their behalf for jobs with prehire seniority: (1) ALPA's "Merger Policies," a written set of principles ratified by the ALPA Board of Directors, and (2) various

1. No explicit reference was made to the proposed 1989 USAir transaction in plaintiffs' complaint or first amended complaint. On November 20, 1992, a magistrate judge of this court denied plaintiffs' motion to amend their complaint to include explicit reference to the proposed transaction. This Court subsequently affirmed that ruling. Plaintiffs contend, however, that a broad reading of the first amended complaint would allow recovery based on the proposed transaction. Because inclusion of the proposed transaction does not affect the Court's disposition of this case, the Court will assume, *arguendo*, that the first amended complaint encompasses the proposed 1989 USAir transaction.

2. Plaintiffs have abandoned all claims arising from the transactions in which United and Northwest acquired Eastern assets.

promises made by ALPA and its officers, prior and subsequent to the decision to strike, regarding ALPA's intent to implement the Merger Policies to protect the rights of striking Eastern pilots. The relevant part of the Merger Policies is a section entitled Fragmentation Policy which, in contrast to the more general provisions of the Merger Policies, contemplates transactions in which the seller of assets retains its own identity and does not merge completely with the acquiring entity. At the time of the strike, the Fragmentation Policy was applicable, by its own terms, "in cases of sales, transfers, purchase, acquisitions, reallocations, farm outs, abandonments, dismemberment or other similar fragmentation of existing operations or route systems or portions thereof. . . ." ALPA's obligations in such situations were outlined in the same version of the Fragmentation Policy as follows:

> ALPA shall take all appropriate actions necessary to protect the affected pilots including a request for adequate labor protective provisions from the appropriate government agency and/or the company or companies involved, the timely enforcement of all contractual provisions in existence, and also assist the affected MECs in opening and processing negotiations with their managements in accordance with Section 6 of the Railway Labor Act. The objective of these actions shall be to produce the desired crew member protection and to maintain a status quo situation until appropriate agreement can be reached with the carrier managements. ALPA must take all steps to establish . . . [t]he right of an appropriate number of pilots from the donor carrier to become employees of the carrier acquiring the operations or route. . . . Questions of number, eligibility, seniority equities and methods of selection of the flight deck operating crew

members involved in said move shall be resolved in accordance with appropriate provisions of the Merger Policy and Procedures, i.e. Negotiations, Mediation and Arbitration.

Pl.Tr.Ex. 208.

ALPA altered its Fragmentation Policy on three occasions subsequent to the Eastern pilots' decision to strike. First, in December 1989, the ALPA Executive Board issued an "interpretation" of the Fragmentation Policy outlining guidelines on the Policy's implementation. The December 1989 interpretation required ALPA to request the "carrier management(s) involved for assurances that pilots will be allowed transfer of employment as determined under ALPA Merger Policy." If, on the basis of this request, carrier management did not give reasonable assurances, ALPA was directed to implement the Fragmentation Policy "through contractual provisions in existence (which cover transfer opportunities)," and to consider use of Section 6 negotiations. ALPA was also directed to request labor protective provisions from the appropriate government agency. Finally, the December 1989 interpretation stated that the ALPA "President or Executive Committee may recommend further action as appropriate to be taken to implement Merger Policy as interpreted herein."[3] Pl.Tr.Ex. 41.

Next, in May 1990, ALPA amended the provision in the Fragmentation Policy which controlled applicability of the Policy. The new provision declared that an applicability determination would be made by the ALPA Executive Committee, based on such considerations as whether the relevant transaction reduced pilot staffing requirements at the carrier disposing of the assets or whether it increased staffing requirements at the acquiring carrier. Pl.Tr.Ex. 49.

---

3. ALPA argues that this interpretation obligated ALPA "to take three steps—and *only* three steps—to persuade the Acquiring Airlines to accept the transfer of . . . pilots with lateral seniority;" (1) a request to management of the acquiring airline for an agreement on lateral transfer, (2) review of existing contractual language for provisions requiring management to accept lateral transfer, and (3) consideration of whether to open Section 6 negotiations. Def.Br. at 33. Plaintiffs, by contrast, contend that the provision

entitling the President or Executive Committee to take further "appropriate" action must be read in conjunction with the text of the Policy, which requires that ALPA "take all steps" to facilitate transfer of pilots to the acquiring airline. Plaintiffs also contend that ALPA's reinterpretation of the Fragmentation Policy, with the possible result that the Union owed fewer obligations to the Eastern pilots, was itself a breach of ALPA's obligations to the pilots.

Finally, in October 1991 ALPA again amended the provision defining applicability of the Fragmentation Policy, adding the following language:

> Fragmentation Policy shall apply if the acquiring carrier declares an intent to acquire assets of another carrier, and the carrier agrees to employ any pilots in conjunction with the assets it acquires and to integrate transferring pilots in accordance with ALPA Merger Policy or an otherwise mutually satisfactory substitute. In the event a carrier does not intend to employ and integrate transferring pilots in accordance with ALPA Merger Policy, or an otherwise mutually satisfactory substitute, the president shall urge the acquiring carrier to do so.[4]

Pl.Dep.Ex. 99.

In addition to the formal Fragmentation Policy, plaintiffs argue that ALPA obligated itself to negotiate on their behalf for jobs with lateral seniority at the acquiring carriers by a number of promises made specifically to the Eastern pilots around the time of the pilots' decision to strike. First, there is vague reference in the deposition of two Eastern pilots to a promise made by ALPA President Henry Duffy, on March 3, 1989, that ALPA Fragmentation Policy would protect the pilots' seniority rights. *See* Dobson Dep. at 45–47; Fugate Dep. at 41–42, 55.[5] Second, on March 13, 1989, the Executive Board passed a resolution finding the Fragmentation Policy applicable "to the current situation at [Eastern]." Third, on March 14, 1989, ALPA issued a press release containing the following language:

> [T]he Executive Board assured Eastern pilots that protections would be provided for them in case of a piecemeal sale or transfer of Eastern aircraft and routes. Such protections would include the right of Eastern pilots to become employees of the carrier acquiring any part of Eastern's operation and preservation of seniority, but are subject to negotiation between

Eastern pilots and the pilots and management of an acquiring airline. In essence, pilots at the acquiring airline will refuse to fly former Eastern routes and aircraft absent such protections for Eastern pilots. Pl.Dep.Ex. 14. Fourth, on April 19, 1989, ALPA sent a videotape to the striking pilots in which President Duffy stressed the Executive Board's decision that Eastern pilots would transfer "with the jobs and with the equipment." Pl.Tr.Ex. 602. Delta representative Jim Suchow also stated in the videotape that he would urge the Delta MEC to support seniority integration. *Id.* Fifth, on July 12, 1989, ALPA's Executive Board passed a resolution affirming that the Fragmentation Policy was applicable to the transfer of fourteen B–727 aircraft from Eastern to Pan Am. Pl.Dep.Ex. 10. Sixth, on July 12, 1989, ALPA sent a videotape to the striking pilots in which President Duffy stated that the Executive Board had defined merger policy to apply to "any future asset transfers that we are likely to encounter from the bankruptcy court" and that "we are going to make every effort to be sure that Eastern pilots go with [the transferred assets]." Pl. Tr.Ex. 604. Seventh, on July 14, 1989, ALPA President Duffy wrote a letter to all ALPA pilots informing them of the actions of the Executive Board on March 13 and July 12 and stating that the Executive Board's actions meant that "Eastern pilots go with Eastern assets in a fair and equitable manner to be determined under merger policy." Pl.Dep.Ex. 11. Eighth, ALPA issued a press release on September 13, 1989, stating that the March 13 Executive Board resolution "mandat[ed] that Eastern pilots *would* be transferred with their seniority intact to any other ALPA carrier that may acquire Eastern aircraft or routes." Pl.Tr.Ex. 254.

Plaintiffs contend that despite these numerous expressions of support for the Eastern pilots, ALPA, under pressure from the MECs at carriers other than Eastern, actually blocked opportunities for the Eastern pi-

---

**4.** As with the prior "interpretation" of Fragmentation Policy, plaintiffs argue that these amendments to the Policy "gutted" the effectiveness of the provision and, therefore, constituted a breach of ALPA's obligations to the plaintiffs.

**5.** The specific terms of any commitment made by Duffy at this meeting are not in the record and, thus, any such promise made by Duffy at that time cannot be evaluated by the Court in connection with the present motion.

lots to be hired with lateral seniority rights. With regard to the 1989 Pan Am transaction, there is deposition testimony from Robert Gould, Pan Am's senior vice president of operations, that Pan Am management was prepared to hire Eastern pilots with lateral seniority in accordance with ALPA Fragmentation Policy, but that opposition within ALPA, specifically from the Pan Am MEC, eventually caused Pan Am to hire pilots from elsewhere. According to Gould, "We didn't hire the Eastern pilots because ALPA failed to reach a unified position on applicability and/or implementation of its own fragmentation policy." Gould Dep. at 30.

In relation to the 1989 Midway transaction, the plaintiffs point to deposition testimony of Jerry Mugerditchian, Midway MEC Chairman, who states that the Chairman of Midway's Board of Directors, David Hinson, told him that Midway would consider hiring Eastern pilots with lateral seniority if Mugerditchian could convince the Midway pilots to accept that arrangement. See Mugerditchian Dep. at 41–42; Pl.Dep.Ex. 210 at 2. Plaintiffs contend that because Eastern pilots were not ultimately hired by Midway in connection with the transaction, a fair inference is that ALPA's inaction in implementation of the Fragmentation Policy torpedoed the deal.[6]

In connection with the proposed 1989 USAir transaction, the USAir management explicitly conditioned the transaction on the requirement that Eastern pilots, qualified to fly the acquired aircraft, would be transferred to USAir with lateral seniority. Dwain Andrews, USAir's Vice President for Labor Relations, testified that he met with representatives of ALPA pilots of USAir and Piedmont (which had previously been acquired by USAir) and that these representatives informed him that lateral integration of Eastern pilots would present "a lot of questions, a lot of issues [and] problems" and that they did not look on the proposal "favorably." Andrews Dep. at 65. According to Andrews,

ALPA never adopted the position that Eastern pilots should be hired by USAir with any form of pre-hire seniority. As a result, USAir began considering plans to staff the acquired aircraft with existing USAir and Piedmont pilots. Ultimately, the 1989 transaction was never consummated; there is no evidence in the record as to the reason for the failure of the deal.

With respect to the 1991 Delta transaction, there is evidence that Robert Shelton, Chairman of the Delta MEC, wrote to J. Randolph Babbitt, President of ALPA, arguing that the Fragmentation Policy did not apply to the Delta transaction, because Eastern, at that point, had ceased operations. Shelton argued that because Eastern's staffing requirements were currently at zero, the sale of its assets could not possibly reduce Eastern's staffing needs—a requirement for applicability of the revised Fragmentation Policy. See Pl.Dep.Ex. 55. Several days later Babbitt wrote to Delta management and asked whether Delta would give assurances that it would accept Eastern pilots with seniority, if ALPA determined that the Fragmentation Policy applied. See Pl.Dep.Ex. 32. Delta management responded with the same theory that Shelton had advanced in his letter to Babbitt. See Pl.Tr.Ex. 98. Plaintiffs argue that the clear inference from this set of circumstances is that Shelton went to Delta's management, argued that the Fragmentation Policy did not apply, and procured Delta's refusal to hire Eastern pilots with lateral seniority.

With respect to the 1991 USAir transaction, Armen Janzen, Chairman of the USAir MEC made a presentation to the Executive Committee on May 20, 1991, arguing that the Fragmentation Policy did not apply to the transaction. President Babbitt wrote to USAir management, as he had to Delta's, asking for assurance that USAir would accept Eastern pilots with seniority, in the event that ALPA determined that the Fragmentation Policy applied. Seth Schofield,

---

**6.** This inference is contradicted by a later portion of Mugerditchian's deposition in which he testifies that in a subsequent meeting with Hinson he, Mugerditchian, represented that the Midway pilots supported lateral integration of the Eastern pilots. Hinson responded that Midway had not expected Mugerditchian to garner the support of the Midway pilots, and that Midway management had no intention of hiring Eastern pilots despite the position of the Midway MEC. See Mugerditchian Dep. at 43.

President and Chief Operating Officer of USAir, responded that USAir would not hire Eastern pilots, either with or without seniority, because the transaction had not increased USAir's staffing requirements, a predicate for the application of the policy. Moreover, even if it had, Schofield noted that USAir was contractually bound to make new positions available to numerous USAir pilots who were on furlough or faced pending furlough. Plaintiffs argue that this "parallelism indicates that Mr. Janzen communicated his views to USAir." Pl.Br. at 22.

Plaintiffs do not dispute that ALPA took actions in *pro forma* compliance with the Fragmentation Policy in connection with every transaction at issue here. But in plaintiffs' view this is not dispositive. Plaintiffs claim that the language in the Fragmentation Policy directing ALPA to take "all appropriate actions" and "all steps" on behalf of affected pilots required ALPA to do more than: (1) formally request the acquiring carriers to hire Eastern pilots with lateral seniority, (2) search existing contractual provisions for enforceable labor protective provisions, and (3) investigate the possibility of opening negotiations between management and the affected MECs under Section 6 of the Railway Labor Act ("RLA"). Specifically, plaintiffs argue that ALPA's failure to negotiate vigorously on their behalf, to present a united front on behalf of *all* ALPA pilots in support of seniority integration, and to threaten negative repercussions if airline management did not accede to the Union's demands, constituted a breach of ALPA's duty of fair representation.

On April 24, 1990, the ALPA Executive Committee passed two resolutions determining that the Pan Am and Midway MECs had discharged their responsibilities in connection with the 1989 transactions. Pl.Dep.Ex. 164. The question whether ALPA had fully complied with the Fragmentation Policy with respect to the February 1991 transactions was placed on the agenda for the July 23–25, 1991, Executive Committee meeting. Prior to the meeting, however, the Eastern MEC asked that resolution of the matter be de-

ferred, pending discussions between the Eastern MEC and the Eastern bankruptcy trustee concerning possible efforts by the trustee to persuade acquiring carriers to hire Eastern pilots with lateral seniority. The Executive Committee agreed to this deferral, "pending a report" on the discussions. *See* Pl.Tr.Ex. 341–A.

Discussion between the Eastern MEC and Martin Shugrue, the bankruptcy trustee, yielded an agreement executed on August 15, 1991 (the "Shugrue Agreement"). Under the terms of the Shugrue Agreement, the Eastern MEC would enter a settlement of various claims that the Eastern MEC had brought against Eastern on the condition that Shugrue succeed, by December 31, 1991, in obtaining commitments, from various airlines acquiring Eastern assets, to hire a specified number of Eastern pilots with lateral seniority rights. On the basis of this agreement the ALPA Executive Committee, at its September 24–26, 1991, meeting, again resolved to defer final resolution of whether the terms of the Fragmentation Policy had been fully met "pending only regular reports on implementation of the [Shugrue Agreement], and subject to further consideration in the event of a relevant change in circumstances." Pl.Tr. Ex. 164.

Despite extensive effort, Shugrue failed in his attempt to obtain any jobs with lateral seniority for the Eastern pilots by December 31, 1991, and thus the settlement outlined by the Shugrue Agreement never became effective.[7] The ALPA Executive Committee never formally resolved the issue of whether ALPA's Fragmentation Policy obligations with respect to the February 1991 transactions were completely satisfied.

On December 3, 1991, the ALPA Executive Committee passed a resolution imposing a custodianship on the Eastern MEC. By the terms of the resolution, the custodianship became effective on January 1, 1992. The Eastern MEC appealed the Executive Committee's decision to the ALPA Executive Board, which denied the appeal in May 1992.

7. Plaintiffs contend that Shugrue was unable to succeed in his negotiations because of the defen-
dants' efforts to block any agreement that resulted in lateral seniority for the Eastern pilots.

The plaintiffs filed their initial complaint in this action on June 3, 1992, and an amended complaint on July 8, 1992. Count I of the complaint alleges that ALPA breached the federally-created duty of fair representation. Counts II, III, and IV were dismissed by Order and Memorandum Opinion of this Court, dated November 3, 1992, in which the Court held that plaintiffs' state law claims were preempted by the federal duty of fair representation. *See Nellis v. ALPA,* 805 F.Supp. 355 (E.D.Va.1992). Count V alleges that certain ALPA officials breached section 501 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 501. Count VI asserts that ALPA's establishment of a custodianship for the Eastern MEC violated 29 U.S.C. § 462. The matter is now before the Court on defendant's motion for summary judgment with respect to plaintiffs' remaining claims—Counts I, V, and VI.

## II.

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R.Civ.P.; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Baber v. Hospital Corp. of America,* 977 F.2d 872, 874 (4th Cir.1992). "A district court must grant summary judgment if, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *Id.* at 874 (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plain-

tiff." *Id.* at 252, 106 S.Ct. at 2512. Finally, "in reviewing the evidence submitted by the parties ..., [the Court] must view all evidence in the light most favorable to the non-moving party." *Baber,* 977 F.2d at 875. Applying these principles to the instant case, the Court is convinced that summary judgment must be entered on behalf of the defendants.

## III.

Because the Union's fair representation duty is the focus of Count I, analysis of that claim appropriately begins with a consideration of the nature and scope of that duty.

Section 2, Eleventh (a) of the RLA grants a duly elected union the exclusive authority to represent all employees in a collective bargaining unit. 45 U.S.C. § 152, Eleventh. Federal courts have long held that the grant of this exclusive right implicitly imposes a corresponding duty on a bargaining representative. Thus, it is undisputed between the parties that " 'as the exclusive bargaining representative of the employees, ... the Union had a statutory duty fairly to represent all of those employees....' " *United Steelworkers of America v. Rawson,* 495 U.S. 362, 372, 110 S.Ct. 1904, 1911, 109 L.Ed.2d 362 (1990) (*quoting Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967)). Under the duty of fair representation doctrine, ALPA's " 'statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, and to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' " *Id.* The Supreme Court has been careful to note, however, that "[a]ny substantive examination of a union's performance ... must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Air Line Pilots Ass'n, International v. O'Neill,* 499 U.S. 65, ——, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991). As a result, the Court has stated that "a breach [of the duty of fair representation] occurs 'only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discrimi-

natory, or in bad faith.'" *Rawson,* 495 U.S. at 372, 110 S.Ct. at 1911 (*quoting Vaca,* 386 U.S. at 190, 87 S.Ct. at 916).

Plaintiffs have, at different points in their argument, alleged that defendants' actions were, at various times, arbitrary, discriminatory, *and* in bad faith. Each of these categories will be considered in turn. First, the Court rejects plaintiffs' contention that ALPA's interpretation and implementation of the Fragmentation Policy with respect to the Eastern pilots was, in any sense, arbitrary. The Supreme Court has properly articulated a deferential standard for evaluating a union's actions for "arbitrariness." In order to prevent a court from substituting "its own view of the proper bargain for that reached by the union," the Court has held that a union's action "may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness' that it is wholly 'irrational' or 'arbitrary.'" *O'Neill,* 499 U.S. at —— ——, 111 S.Ct. at 1135–36 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)).

While the parties disagree concerning whether ALPA fulfilled its representational obligations to the plaintiffs, the parties are at least in tacit agreement that any shortcoming in ALPA's representation was not a consequence of capricious or irrational action by ALPA. As the ample record makes manifest, ALPA's position on the implementation of the Fragmentation Policy was the result of an extensive series of meetings of ALPA's Executive Committee, in which the Committee meticulously parsed the language of the Merger Policy and delineated exactly what actions ALPA was required to undertake on behalf of the Eastern pilots. Clearly, ALPA's failure to negotiate with sufficient vigor to appease the Eastern pilots was a result of the simple fact that ALPA also represented pilots at the airlines that acquired Eastern assets. As a result, ALPA found itself in a position in which the interests of various subgroups of its membership were in conflict with one another.

Negotiations for enhanced seniority for the Eastern pilots at the acquiring airlines necessarily impacted on the relative position of the pilots already working for the acquiring airlines. It is uncontradicted in the record, and not surprising given the nature of the situation, that the initial opposition to application of the Fragmentation Policy came from the MECs at the airlines acquiring Eastern assets. After all, pilots at these acquiring airlines faced the prospect of Eastern pilots being hired to positions with seniority over them. Opposition of the MECs at the acquiring airlines eventually led ALPA's national leadership to temper its commitment to vigorous negotiation on behalf of the Eastern pilots for positions with lateral seniority.

Though plaintiffs may disagree with ALPA's decision to accede to the wishes of the pilots at the acquiring airlines, they cannot argue that it was *irrational* for ALPA to do so, particularly since the Eastern pilots were outnumbered by the pilots, also represented by ALPA, whose self-interest would lead them to oppose seniority integration. A union leadership's decision to follow the wishes of the majority of its members is not merely rational, but is the very essence of union democracy. *See, e.g., Rakestraw v. United Airlines, Inc.,* 981 F.2d 1524, 1533 (7th Cir.1992) ("If the union's leaders took account of the fact that the workers at the larger firm preferred this outcome, so what? Majority rule is the norm."). Thus, while some of plaintiffs' arguments pose difficult questions under the duty of fair representation doctrine, the Court has little trouble concluding that ALPA's actions in the present context were neither irrational nor arbitrary.

Neither have the plaintiffs adduced any evidence of bad faith on the part of the Union. As evidence of ALPA's bad faith, plaintiffs appear to rely exclusively on the fact that ALPA undertook certain negotiating obligations pursuant to the Fragmentation Policy and then allegedly failed to fulfill those obligations. Yet the mere fact that a union has made certain promises, but not fulfilled them, does not mean that the promises were made in bad faith. When analyzing a union's conduct for "bad faith" in this context, courts have consistently required proof that the promises made by the union were "intentionally misleading." *Swatts v.*

*United Steelworkers of America,* 808 F.2d 1221, 1225 (7th Cir.1986); *see also O'Neill v. Air Line Pilots Ass'n, International,* 939 F.2d 1199, 1202–03 (5th Cir.1991); *Bautista v. Pan American World Airlines, Inc.,* 828 F.2d 546, 550–51 (9th Cir.1987).[8] In other words, proof of a union's bad faith requires a showing that the union never intended to keep its promises.

No such evidence exists here; nothing in this record supports an inference that ALPA ever undertook a commitment to the Eastern pilots that it did not intend to honor. Rather, the record indicates that ALPA national leadership initially promulgated the provisions of the Fragmentation Policy dealing with lateral seniority integration in the sincere belief that such a regime would be beneficial to the career security of *all* ALPA pilots. *See* Letter of ALPA President Henry Duffy, July 14, 1989, Pl.Dep.Ex. 11 ("[W]e must find a system of 'portable' seniority to protect our fellow pilots whose careers are shattered by such catastrophic circumstances as [carrier fragmentation].... I hope that we have now matured enough as a union to realize that we *must* protect our own.") Similarly, the ALPA membership had reason to support the principle of lateral integration so long as it remained a generality, from which they were as likely to benefit as to be

harmed. Only when it became apparent that Eastern would be the fragmented airline, that Eastern pilots would be the beneficiary of the Fragmentation Policy, and that the pilots at the other carriers were the ones who would be relatively disadvantaged, did the majority of ALPA membership, and eventually the ALPA national leadership, flag in its support for lateral integration. While the plaintiffs may justifiably be upset that ALPA did not hold firm to its initial enthusiasm for seniority integration in the face of the majority of its members who had reason to oppose the policy, plaintiffs cannot argue that ALPA's initial promulgation of the policy, or ALPA's early statements in support of the policy, were intended to be "intentionally misleading" to the plaintiffs. Accordingly, the Court finds no evidence of "bad faith" on the part of the Union.[9]

■ Finally, this Court must assess whether ALPA's alleged refusal to fulfill its obligations under the Fragmentation Policy for the benefit of the Eastern pilots could be found to be discriminatory. "The objective of the duty of fair representation is to provide substantive and procedural safeguards for minority members of the collective bargaining unit." *Jones v. Trans World Airlines, Inc.,* 495 F.2d 790, 798 (2nd Cir.1974); *see also Beardsly v. Chicago & North West-*

---

**8.** In *Local No. 48 v. United Brotherhood of Carpenters & Joiners,* 920 F.2d 1047, 1054 (1st Cir. 1990), the First Circuit held that union leadership could be found to have acted in bad faith if it intentionally misled its membership *or* if it acted in a "palpably unconscionable or outrageous" fashion. The court further held, however, that evaluation of a union's conduct for unconscionability or outrageousness was essentially the same inquiry as whether the union had violated the duty of fair representation by acting arbitrarily. *Id.*

**9.** Plaintiffs also contend that statements made by some of the individual defendants indicate the bad faith necessary to form the basis of a breach of the duty of fair representation. For instance, plaintiffs point to the arguments made to the ALPA Executive Committee by Delta MEC Chairman Robert Shelton and USAir MEC Chairman Armen Janzen that Fragmentation Policy should not apply to the assets acquired by their respective airlines at the February 1991 bankruptcy auction. Plaintiffs also cite a letter written by the USAir MEC to its members referring to the substantial effort it had undertaken in "defend-

ing you against former Eastern Airlines pilot's claims to jobs." Pl.Tr.Ex. 389.

These statements are not evidence of bad faith. As shown above, ALPA owed conflicting representational duties. Under the ALPA organizational structure it was inevitable that certain members of the ALPA leadership hierarchy, *i.e.* the MEC representatives of the acquiring carriers, would espouse positions contrary to the interests of the Eastern pilots. It is not necessary to accept the defendants' argument, that the ALPA Merger Policies "contemplate that the affected MECs act in an *adversarial* manner ... advocat[ing] solely the interests of [their] own pilots," Def.Br. at 8–9, in order to discern that any organization, faced with duty of representing disparate interests, will have internal disputes, and that the individuals entrusted with preserving the interests of a particular subgroup will make statements contrary to the interests of an opposing subgroup. The fact that the MECs at the acquiring carriers opposed application of the Fragmentation Policy is not evidence that ALPA *intentionally misled* the plaintiffs by promulgating and initially voicing support for the lateral seniority integration provisions of the Policy.

*ern Transp. Co.,* 850 F.2d 1255, 1266–68 (8th Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989). Accordingly, "a union may not neglect the interests of a membership minority solely to advantage the membership majority." *Teamsters Local Union No. 42 v. NLRB,* 825 F.2d 608, 611 (1st Cir.1987).

The factual circumstances in the instant case raise the possibility that the plaintiffs were treated in a discriminatory fashion. Until it became obvious which airline faced fragmentation of its assets, pilots at all the carriers stood an equal chance of benefitting under the Fragmentation Policy. Only when it became evident that it was the Eastern pilots who were likely to benefit from the implementation of the policy, to the relative disadvantage of the pilots at the acquiring airlines, did the self interest of the acquiring airlines' pilots cause them to oppose vigorous implementation of the Policy. Thus, when Eastern began disposing of its assets to other carriers, the Eastern pilots were thrust into the position of advocating a minority interest within ALPA, as the sole group favoring forceful implementation of the Fragmentation Policy. As a minority interest group within ALPA, the Eastern pilots were entitled to protection against discrimination.

Existing precedent in this circuit and elsewhere is unclear on precisely what constitutes impermissible discrimination by a union against a minority interest within the union's membership. Obviously, a rule that always vindicates the interests of a minority would eviscerate the concept of union democracy. The entire premise of democracy is that majority interests will generally prevail over the minority. *See Rakestraw,* 981 F.2d 1524, at 1533. Thus, there must be some limiting principle to the concept that a union must refrain from taking actions injurious to the interests of one of its minority subgroups. *See Humphrey v. Moore,* 375 U.S. 335, 349, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964) ("we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another").

At least one influential decision has implied that discrimination against a minority is impermissible, only when it is either arbitrary (*i.e.* "not based on some rational consideration") or in bad faith. *See Jones,* 495 F.2d at 798. If this formulation were adopted here, plaintiffs would have no colorable claim of impermissible discrimination because, as shown above, defendants' actions were neither arbitrary nor in bad faith. This result, while not without superficial appeal, would be incorrect, as it would render the term "discriminatory" redundant and meaningless. The Court cannot accept the premise that the "arbitrary, discriminatory, or in bad faith" standard enunciated by the Supreme Court in 1967, *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916, and since cited by innumerable courts as a tripartite test, is actually a bipartite "arbitrary or in bad faith" standard. Rather, a fairer reading of the *Vaca* language dictates that certain actions by a union may constitute impermissible discrimination without involving arbitrary or bad faith conduct.

No reported decision has fully come to grips with the competing concerns implicated in protecting the rights of minorities within a union. While the test for impermissible discrimination must be broader than merely arbitrary or bad faith conduct, it cannot be so broad that it unduly disrupts the functioning of democratic decision-making within the union. With these competing concerns in mind, this Court adopts the following proposition: while a union is free to establish its internal policies on the basis of majority rule, the union is not free to ignore properly enacted and promulgated policies whenever such a course is convenient or beneficial to the majority of the union's membership. In other words, a union is bound to follow its official policies unless and until they are amended by means approved under the union's constitution.

As applied to the facts of the present case, the Court holds that while ALPA was free to take any position it desired on the lateral integration of pilots in the event of carrier fragmentation, it could not, even at the behest of the majority of its membership, disregard its policy on that issue once the policy was established and a subgroup of the ALPA

membership stood ready to benefit from it. If, as plaintiffs allege, ALPA failed to implement the Fragmentation Policy, as promulgated in ALPA's official Merger Policies, that failure would constitute impermissible discrimination against the plaintiffs in violation of ALPA's duty of fair representation.

■ Certain of plaintiffs' claims do not rely upon the theory of impermissible discrimination as delineated above and, because plaintiffs have failed to adduce any evidence of arbitrariness or bad faith, these claims cannot, as a matter of law, go forward. This is true of plaintiffs' claim that ALPA, over time, impermissibly "gutted" the effectiveness of the Fragmentation Policy, by means of the December 1989 interpretation of the Policy and the May 1990 and October 1991 amendments to the Policy. Respect for the process of union democracy compels the conclusion that ALPA was free to take any position it desired on the issue of lateral seniority integration in the event of carrier fragmentation. The fact that ALPA's commitment to seniority integration eroded over time, and that this change was reflected in amendments to the language of the Fragmentation Policy, is not an actionable violation of the duty of fair representation.[10]

■ Similarly, plaintiffs can make no valid claim for defendants' alleged interference with negotiations under the Shugrue Agreement. No official ALPA policy required ALPA to take any position with respect to the negotiations between Shugrue, the Eastern bankruptcy trustee, and the managements of the acquiring airlines. Thus, even if plaintiffs' allegations are true, and it was the actions of the defendants that resulted in the failure of the Shugrue Agreement, this occasions no actionable claim for breach of the duty of fair representation. Because ALPA did not have a policy with respect to such situations, there can be no argument that ALPA administered its policies in a discriminatory fashion.

■ Finally, plaintiffs can make no successful claim with respect to the proposed 1989 USAir transaction. As it existed in 1989, the Fragmentation Policy applied only to "sales, transfers, purchase, acquisitions, [etc.]" of carrier assets. Because the proposed USAir transaction involved only an offer, not a consummated deal, ALPA incurred no Fragmentation Policy obligations with respect to the transaction. In the absence of specific obligations under its internal policies, ALPA cannot be held to have impermissibly discriminated against the plaintiffs.

Accordingly, if plaintiffs have a valid claim under the duty of fair representation, it must be based on a showing that ALPA violated the express terms of its Fragmentation Policy in connection with completed transactions in 1989 or 1991.

## IV.

■ As a threshold matter, the Court must determine whether the claims related to the 1989 or the 1991 transactions are barred by the statute of limitations. A six month statute of limitations applies to a union member's claim of breach of the duty of fair representation under the RLA. *See Meekins v. United Transp. Union,* 946 F.2d 1054, 1057 (4th Cir.1991).[11] "A claim for

---

10. Plaintiffs may understandably take little consolation from the Court's holding that while ALPA was not permitted to ignore the Fragmentation Policy to plaintiffs' detriment, ALPA was free to alter the Policy in such a way as potentially to deprive plaintiffs of the Policy's benefits. The fact remains, however, that it is simply not discriminatory for a union to alter its policy by means of procedures in accordance with the union's constitution, which procedures presumably give all subgroups an opportunity to participate in the union decision-making process. Minorities derive protection from the fact that such modifications of policy are subject to the continuing requirement that a union avoid arbitrary or bad faith conduct. *See Jones,* 495 F.2d at 798 ("[a] union has broad discretion to adjust the demands of competing groups within its constituency as long as it does not act arbitrarily"). Moreover, requiring a union to adhere to its constitutional procedures for altering union policy ensures that any policy reversal will receive a certain degree of scrutiny from the union membership. Such visibility places limits on the union's ability to engage in discriminatory conduct.

11. Plaintiffs, in a supplemental memorandum in opposition to defendants' motion for summary judgment, argue that the Supreme Court's decision in *Reed v. United Transp. Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), casts doubt on whether the six month statute of limitations applies to all duty of fair representation

such a breach accrues when the plaintiff knows, or should have known, that the grievance procedure has been exhausted or otherwise broken down." *Id.*

As mentioned above, the ALPA Executive Committee passed a resolution on April 24, 1990, to the effect that ALPA had completely fulfilled its Fragmentation Policy obligations with respect to the 1989 transactions. Thus, plaintiffs knew by that date, at the latest, that their efforts to goad ALPA into further action on their behalf in connection with these transactions had definitively failed. Because this lawsuit was not commenced until June 3, 1992, plaintiffs concede that unless this Court adopts plaintiffs' "continuing violation" theory (see discussion *infra.*), the claims with respect to the 1989 transactions must be barred by the six month statute of limitations.

■ The situation with respect to the February 1991 transactions is less clear. Defendants argue that, in light of the totality of the circumstances, plaintiffs must have known prior to December 3, 1991, that ALPA was not going to make any further negotiating effort on their behalf in connection with these transactions, and therefore, that the lawsuit

filed on June 3, 1992, must be barred by the six month statute of limitations. In particular, defendants stress that the Eastern MEC wrote letters to ALPA President Babbitt dated June 14, 1991, and July 10, 1991, charging that the MECs of the acquiring carriers were "engaged in a flagrant attempt to frustrate the objectives of [the Fragmentation Policy]." Pl.Dep.Ex. 47; *see also* Pl.Dep.Ex. 254. These letters, defendants argue, clearly indicate that plaintiffs knew, at the time the letters were written, that ALPA, through its MECs, had failed to comply with its Fragmentation Policy obligations.

Contrary to defendants' contention, however, the letters in question unmistakably indicate that the Eastern MEC had not abandoned the hope of convincing ALPA national leadership to override the intransigence of the acquiring carriers' MECs and to mandate vigorous implementation of the Fragmentation Policy. Furthermore, the actions of ALPA's national leadership in response to these letters did not foreclose the possibility that ALPA would put additional pressure on the MECs or the managements of the acquiring airlines to hire Eastern pilots with lateral seniority. Instead, the ALPA Executive

---

actions. The Supreme Court had held in *Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), that the six month period set forth in section 10(b) of the National Labor Relations Act ("NLRA") should be applicable to an employee's hybrid action against both an employer for breach of a collective bargaining agreement and a union for breach of the duty of fair representation. *Reed*, however, cautioned that *Del Costello* should be read as a narrow exception to the general rule that statutes of limitation for analogous state offenses should ordinarily be borrowed to define the limitations period for federal offenses. Several courts, subsequent to *Reed*, have held that the six month NLRA period should not be applicable to some duty of fair representation claims, when such claims stand alone, as in the instant case, and are not, as in *Del Costello*, part of a hybrid action. Specifically, courts have held that the six month period is not applicable to non-hybrid actions when the "dispute is entirely internal to the union." *Brenner v. Local 514*, 927 F.2d 1283, 1295 (3rd Cir. 1991); *accord Phelan v. Local 305*, 973 F.2d 1050, 1061 (2nd Cir.1992) (six month period not applicable to non-hybrid duty of fair representation claims that do "not have a direct and immediate impact on union-management relations").

While there is some merit to plaintiffs' contention that the six month NLRA limitations period should not apply in all duty of fair representation cases, there are two problems with plaintiffs' argument in the present context. First, there is the Fourth Circuit's decision in *Meekins*, decided after *Reed* (and *Brenner*), which unequivocally states that the six month limitations period is applicable to non-hybrid duty of fair representation claims. 946 F.2d at 1057. No exception equivalent to that set forth in *Brenner* was considered. *Id.* (although it *is* possible that the Fourth Circuit may have felt no need to address the merits of *Brenner* because the claim in *Meekins* was clearly not "entirely internal to the union"). Second, even if this Court were to accept the premise that state statutes of limitation apply in some non-hybrid duty of fair representation cases, the instant case appears to be a claim for which the NLRA limitations period *should* be applicable. The gravamen of plaintiffs' complaint is that ALPA did not sufficiently negotiate on plaintiffs' behalf with the acquiring airlines. Accordingly, judgment in favor of the plaintiffs would likely have "a direct and immediate impact" on relations between ALPA and future acquiring airlines, and thus, the claim cannot be characterized as "entirely internal to the union." *C.f. Brenner*, 927 F.2d at 1295; *Phelan*, 973 F.2d at 1061.

Committee placed the issue of whether the MECs at the acquiring airlines had fully complied with their Fragmentation Policy obligations on the agenda for the Committee's July 23–25, 1991, meeting. The Executive Committee later agreed, at the Eastern MEC's behest, to defer resolution of the matter during the pendency of the negotiations leading up to the Shugrue Agreement. Then, because of the possibility that Shugrue would succeed in his negotiations and acquire lateral seniority jobs for the Eastern pilots, the Executive Committee again deferred the matter, "pending only regular reports on implementation of the [Shugrue Agreement], and subject to further consideration in the event of a relevant change in circumstances." The Executive Committee has, to date, never enacted a final resolution on whether ALPA has definitively fulfilled its obligations under the Fragmentation Policy with respect to the 1991 transactions.

Because the plaintiffs never received final notification that ALPA would take no further· action on their behalf with respect to the 1991 transactions, it is difficult to pinpoint exactly when the plaintiffs knew, "or should have known, that the [union] grievance procedure [had] been exhausted or otherwise broken down." *Meekins,* 946 F.2d at 1057. As defendants argue, eventually plaintiffs must be deemed to have known that ALPA did not intend to take further measures, solely by reason of the inaction of the Executive Committee. Plaintiffs are correct, however, that because the Executive Committee deferred action in contemplation of negotiations under the Shugrue Agreement, it was not remarkable from the plaintiffs' perspective that the Executive Committee failed to act during the pendency of the negotiating period set forth in that agreement. Only after the Shugrue Agreement had lapsed did the Committee's inaction reasonably raise the inference that ALPA was unwilling to proceed further on the plaintiffs' behalf. By its terms, the Shugrue Agreement gave Shugrue until December 31, 1991, to try to acquire jobs for the Eastern pilots. Thus, whenever the plaintiffs cause of action accrued with respect to the February 1991 transactions, it was sometime *after* December 31, 1991. As a result, plaintiffs' suit with respect to these transactions, filed June 3, 1992, was timely under the six month statute of limitations.

Defendants argue, in the alternative, that plaintiffs' cause of action accrued, not when ALPA refused to take action with respect to the individual transactions, but rather when ALPA "interpreted" the Fragmentation Policy in December 1989 to limit the Union's responsibilities in fragmentation situations. In support of this argument, defendants cite *Local Lodge No. 1424 v. NLRB,* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (*"Bryan Manufacturing"*), which held that, for statute of limitations purposes, an unfair labor practice charge accrued when a union executed an allegedly unlawful collective bargaining agreement, not when the agreement, valid in all respects other than in its formation, was actually enforced. Defendants argue by analogy that in this case, the harm to the plaintiffs arose from ALPA's amendment of the Fragmentation Policy, not from the subsequent implementation of the Policy with respect to individual transactions.

This argument is without merit. Plaintiffs' alleged harm does not arise exclusively from their claim that ALPA watered down the Fragmentation Policy and then enforced that Policy on a number of separate occasions. Instead, plaintiffs contend that defendants' actions were so deficient that the defendants did not even fulfill their obligations under the weakened Fragmentation Policy. Taken as true, the allegations charge a violation of plaintiffs' rights with respect to each individual transaction. In the lexicon of the decisions in this area of the law, ALPA's actions constituted a "continuing violation." As such, a new cause of action, with a separate statute of limitations, accrued each time that ALPA failed to abide by its Policy. *C.f. National Advertising Co. v. Raleigh,* 947 F.2d 1158, 1166–1168 (4th Cir.1991) (finding no "continuing violation" because harm to plaintiffs occurred at enactment of ordinance, not subsequent enforcement of ordinance), *cert. denied,* —— U.S. ——, 112 S.Ct. 1997, 118 L.Ed.2d 593 (1992).

■ Plaintiffs argue that the "continuing violation" doctrine saves not only those claims that fall inside the limitations period,

but also those claims outside the period— specifically, the claims based on the 1989 transactions. As the Fifth Circuit has recently explained,

> [T]he continuing violation doctrine embraces two types of cases. The first includes cases in which the original violation occurred outside the statute of limitations, but is closely related to other violations that are not time-barred. In such cases, recovery may be had for all violations, on the theory that they are part of one, continuing violation.... The second type of continuing violation is one in which an initial violation, outside the statute of limitations is repeated later; in this case, each violation begins the violation period anew, and recovery may be had for at least those violations that occurred within the period of limitations.

*Hendrix v. Yazoo City,* 911 F.2d 1102, 1103 (5th Cir.1990). Plaintiffs contend that, in this case, ALPA's actions should be characterized as a unified strategy to evade its responsibilities under the Fragmentation Policy and not as a series of individual determinations to decline to apply the Fragmentation Policy to particular transactions. As such, defendants' actions would constitute a "continuing violation" of the first type identified by *Hendrix,* and recovery should be allowed for both the 1991 transactions within the limitations period, *and* the 1989 transactions outside the period.

The Court confesses some uneasiness with the theory underlying the "first type" of "continuing violation." The determination critical to application of the doctrine, whether the acts outside the limitations period are sufficiently similar to acts inside the period such that the entire course of action should be viewed as a "continuing violation," appears to be an essentially standardless inquiry. No court has articulated a satisfying test or formulation that would meaningfully limit the doctrine's application. Nevertheless, the theory appears to be firmly grounded in federal jurisprudence. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982) (statute of limitations for Fair Housing Act, 42 U.S.C. § 3612(a), does not bar claims based on five incidents, four of which were outside limitations period, when claims "are based not solely on isolated incidents ..., but a continuing violation manifested in a number of incidents"); *Brenner,* 927 F.2d at 1295–96 (applying "continuing violation" theory to union member's claims against union to preserve claims based on events outside the limitations period). Accordingly, despite reservations concerning the "continuing violation" theory being applied in this fashion, the Court will endeavor to implement the appropriate standard and determine whether ALPA's actions can accurately be characterized as "a continuing violation manifested in a number of incidents" or, instead, as a series of "isolated incidents." *Havens Realty,* 455 U.S. at 381, 102 S.Ct. at 1125.

The Court's task is made substantially easier by the fact that the question is presented on defendants' motion for summary judgment. As the Fourth Circuit has recently held, "In general, issues of fact bearing on the application of a statute of limitations are submitted, as are other issues of fact, for determination by the jury." *Fowler v. Land Management Groupe, Inc.,* 978 F.2d 158, 162 (4th Cir.1992). Thus, whether or not ALPA's actions amounted to a "continuing violation" throughout the years 1989, 1990, and 1991 is a question that must ultimately be decided by the jury, and this Court need only determine whether plaintiffs have submitted sufficient evidence for a reasonable jury to find in plaintiffs' favor. *See Taylor v. Home Insurance Co.,* 777 F.2d 849, 856–57 (4th Cir.1985) (approving district court's submission of "continuing violation" question to the jury), *cert. denied,* 476 U.S. 1142, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986).

Based on this standard, the issue must be for the jury, for there is no doubt that plaintiffs have produced sufficient evidence to create a factual issue on whether ALPA's actions constituted a "continuing violation." Under plaintiffs' theory, ALPA's national leadership reached a determination in 1989 that obtaining jobs with lateral seniority at the acquiring carriers for the Eastern pilots would be politically unpopular with the majority of the ALPA membership. As a result, according to plaintiffs, ALPA engaged

in a unified strategy to minimize and evade its obligations to the Eastern pilots under the Fragmentation Policy. If plaintiffs' theory is accepted, then ALPA's actions would indeed constitute a "continuing violation." In the Court's view, a reasonable jury could draw sufficient inferences from the factual record to accept plaintiffs' theory. As a consequence, summary judgment is inappropriate. Because plaintiffs have properly alleged a "continuing violation" encompassing both the 1989 and the 1991 transactions, and because the cause of action with regard to the 1991 transactions accrued inside the six month statute of limitations period, the Court declines to enter summary judgment, on statute of limitations grounds, on any of plaintiffs' claims.

## V.

As explained above, defendants' actions would only be a breach of the duty of fair representation if defendants violated the express terms of the duly-enacted Fragmentation Policy. After full consideration of the matter, and taking the evidence in the light most favorable to the plaintiffs, the Court ultimately concludes that no reasonable factfinder could find that ALPA violated the terms of the Policy.

There are two provisions in the version of the Fragmentation Policy applicable to the 1989 transactions that set forth ALPA's obligations to the pilots of a fragmented airline. First, the Policy states, "ALPA shall take all appropriate actions necessary to protect the affected pilots.... The objective of these actions shall be to produce the desired crew member protection...." Subsequently, the Policy states, "ALPA must take all steps to establish ... [t]he right of an appropriate

number of pilots from the donor carrier to become employees of the carrier acquiring the operations or route."

Plainly, the first provision can be interpreted as a requirement that ALPA take some action to obtain seniority integration for the pilots of a fragmented carrier. ALPA's obligation under this provision, however, is expressly limited to "all *appropriate* actions." Similarly, ALPA's goal under this provision is not necessarily full seniority integration, but rather "the *desired* crew member protection." Without question, the policy was written in such a fashion as to preserve a degree of flexibility for ALPA in determining what constitutes "appropriate" action and the "desired" crew member protection.

Anticipating that this Court would be forced to rule on whether ALPA had, in fact, taken "appropriate" actions on behalf of the plaintiffs, the parties have devoted significant argument to the proper level of deference courts owe to a union's interpretation of its own instruments of governance. The Fourth Circuit, it appears, has not spoken definitively on this issue, while other federal courts have developed differing formulations to express the deference due in this situation.[12] It is unnecessary, however, to try to anticipate how the Fourth Circuit would articulate the standard of deference generally owed to a union in this context. In this case, the language used to express the union's policy explicitly reserves for the union a certain degree of discretion in implementing the policy. When reviewing a union's decision under a policy that expressly vests such discretion in the union leadership, this court must plainly accord the highest degree of deference to the union's decision. *See, e.g. Local No. 48*, 920 F.2d 1047, 1051 ("Courts have neither a

---

12. The alleged split among the circuits on this issue is more apparent than real. All courts that have addressed the topic agree that substantial deference is due. The only difference among the circuits is how they have chosen to express the circumstances upon which a court can reject a union's interpretation. Thus, the Sixth Circuit has suggested that the union's interpretation must be "fair and reasonable." *Millwright Local No. 1079 v. United Brotherhood of Carpenters & Joiners*, 878 F.2d 960, 965 (6th Cir.), *cert. denied*, 493 U.S. 965, 110 S.Ct. 407, 107 L.Ed.2d 373 (1989). The Ninth Circuit has held that the

union interpretation should not be disturbed by a court "absent bad faith or special circumstances." *Motion Picture & Videotape Editors Guild, Local 776 v. Local 659*, 800 F.2d 973, 975 (9th Cir.1986), *cert. denied*, 483 U.S. 1022, 107 S.Ct. 3267, 97 L.Ed.2d 765 (1987). The First Circuit has ruled that a union's interpretation will be upheld unless it is "patently unreasonable." *Local No. 48*, 920 F.2d at 1052. It is doubtful that these semantic differences in expressing the standard would, in practice, lead to divergent results.

monopoly on fairness nor a sufficient expertise in the administration of labor organizations to warrant pervasive judicial intervention in union affairs."). Review on any lesser standard would cause this Court to run the risk of attempting "to substitute its own view ... for that reached by the union." *O'Neill,* 499 U.S. 65, 111 S.Ct. 1127. Accordingly, the standard this Court will employ in reviewing ALPA's implementation of the Fragmentation Policy is whether ALPA's decision with respect to the "appropriate actions" to take on plaintiffs' behalf was "patently unreasonable." *Local No. 48,* 920 F.2d at 1052.

ALPA's determination of what constituted an "appropriate" response to the 1989 transactions was not "patently unreasonable." In fact, ALPA took a number of steps beneficial to the interests of the Eastern pilots. First, prior to the Bankruptcy Court's approval of the asset transfers, ALPA objected to the transfers because they did not include commitments by the acquiring carriers to hire Eastern pilots with lateral seniority. *See* Copeland Dep. at 300. Second, the ALPA Executive Committee passed resolutions notifying all concerned parties, including management and pilots at the acquiring carriers, that ALPA considered the Fragmentation Policy applicable to the transfer of Eastern's assets to Pan Am and Midway. With respect to Pan Am, where management initially showed some willingness to hire Eastern pilots with lateral seniority, the Executive Committee authorized appointment of a Neutral Facilitator to "assist in achieving an expedited, fair and equitable" seniority integration plan. In connection with the Midway transaction, Midway MEC Chairman Mugerditchian met with Midway management to represent that he had the support of the Midway pilots for hiring Eastern pilots on terms that included lateral seniority integration.

Because neither Pan Am nor Midway ultimately hired Eastern pilots with any form of pre-hire seniority, plaintiffs argue that ALPA did not negotiate vigorously enough on their behalf, and accordingly that ALPA violated its obligations under the Fragmentation Policy. Plaintiffs contend that ALPA could easily have put "teeth" in its negotiating stance by causing its members to undertake collective action, such as refusal to fly the newly acquired aircraft, work slowdowns, or work stoppage, unless the acquiring carriers agreed to hire Eastern pilots with lateral seniority. The Court does not believe, in light of ALPA's conflicting representational duties, that the decision not to undertake such measures was "patently unreasonable." While such actions may have been permissible means of forwarding ALPA's aims, they were not required by the terms of the Fragmentation Policy. Had the ALPA membership desired that ALPA be forced to take specific steps to force airline management to accede to demands for seniority integration, the Fragmentation Policy could have been written to detail those specific steps. That was not done. Instead, the Policy plainly vests the ALPA leadership with the discretion to determine what actions are "appropriate" when seeking to achieve commitments for seniority integration.[13]

Likewise, plaintiffs cannot avail themselves of the second provision of the Fragmentation Policy setting forth ALPA's obligations to the pilots of a fragmented airline. That provision states that ALPA must take *all* steps to establish the right of an appropriate number of pilots from the fragmented airline to become employees of the acquiring airlines. Significantly, however, the provision makes no mention of whether such employment must be coupled with seniority rights. There is no dispute that ALPA formulated and implemented a program for Eastern pilots throughout the period of 1989–91 in which those pilots would receive preferential con-

---

**13.** An example of ALPA's ability to commit itself to specific means of implementing a negotiating position is contained in the section of its Merger Policies devoted to actual mergers. In that section, the policy states:

R. *Work Stoppage in Merger Cases*
ALPA is directed and all of the members hereby bind themselves to use maximum pressure, including work stoppage, to achieve necessary protection for all flight deck operating crew members involved.
Pl.Tr.Ex. 208. No similar provision exists in the section of Merger Policies devoted to fragmentation of airlines.

sideration by other carriers as "new hires." While the actual terms of the program are not in the record, there has been no allegation from the plaintiffs that the program was inadequate in meeting its goal. Rather, plaintiffs challenge the sufficiency of the goal of the program, contending that the Fragmentation Policy required ALPA to negotiate for jobs with lateral seniority for the Eastern pilots, not for "new hire" positions. By the plain language of the provision in question, however, ALPA met its obligation to establish the right of the plaintiffs "to become employees of the [acquiring] carrier[s]." As a result, the Court finds no evidence of discriminatory implementation of the Fragmentation Policy with respect to the 1989 transactions.

As outlined above, by the time of the 1991 transactions, ALPA had reinterpreted and amended the Fragmentation Policy.[14] Pursuant to the December 1989 interpretation, ALPA was required to request the "carrier management(s) involved for assurances the pilots will be allowed transfer of employment as determined under ALPA Merger Policy." If ALPA did not receive reasonable assurances, it was directed to implement the Fragmentation Policy through existing contractual provisions and to consider use of Section 6 negotiations. Plaintiffs do not dispute that all of these actions were undertaken in connection with the 1991 transactions, in technical compliance with the terms of the Fragmentation Policy. Plaintiffs contend, however, that the duty of fair representation obligated ALPA to take further action on their behalf under the authority conferred by the December 1989 interpretation to the effect that the "President or Executive Committee may recommend further action as appropriate to be taken to implement Merger Policy...."

This argument fails; in this respect the Policy is permissive, not mandatory. More-over, as with the 1989 version of the Fragmentation Policy, plaintiffs are placed in the position of challenging ALPA's determination of what was "appropriate" action, when the Policy clearly vests discretion in the Union leadership to define what actions are "appropriate." This Court cannot substitute its judgment of what actions were "appropriate" for that of the Union. *See O'Neill,* 499 U.S. at ——, 111 S.Ct. at 1127. As long as the determination is not "patently unreasonable," it is for the Union leadership, not this court, to decide what actions are "appropriate" means of implementing ALPA policy. In light of ALPA's conflicting representational duties to Eastern and non-Eastern pilots, it was certainly not "patently unreasonable" for ALPA to decide that strict compliance with the steps outlined by the Fragmentation Policy, with no further action recommended by the President or the Executive Committee, was the "appropriate" means of carrying out its obligations under the Policy.

In sum, ALPA complied with the literal terms of its Fragmentation Policy with respect to every transaction challenged by the plaintiffs. It is true that ALPA met its obligations with significantly less enthusiasm or resolve than plaintiffs expected would be the case. Nevertheless, minorities within a union must expect that the union leadership will frequently make decisions adverse to their interests, if those interests are in conflict with the interests of the majority. As discussed above, ALPA could only be found to have *impermissibly* discriminated against the plaintiffs if, in acting against the minority's interests, it violated the terms of a duly ratified union policy. Because there is no evidence that ALPA failed to comply with the literal terms of the Fragmentation Policy, summary judgment is properly entered against plaintiffs on Count I of the complaint.[15]

---

14. By the terms of the 1990 amendment, the ALPA Executive Committee was required to make a preliminary determination on the applicability of the Fragmentation Policy. At its meeting on May 20, 1991, the Executive Committee found the Fragmentation Policy applicable to the February 1991 transactions.

15. The Court's holding is not altered by the existence of specific promises made to the Eastern pilots concerning ALPA's commitment to negotiate for lateral seniority jobs. A review of the promises indicates that most were merely promises that ALPA Fragmentation Policy would be applied to the situation at Eastern. As explained above, the Fragmentation Policy *was* applied to each of the challenged transactions, albeit with

## VI.

Count V alleges that the individual defendants, all past and present officials of ALPA, violated fiduciary duties owed to the Union under section 501 of the LMRDA, 29 U.S.C. § 501. Section 501(a) provides, in relevant part:

The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.

29 U.S.C. § 501(a). Section 501(b) authorizes a member of a labor union to sue an individual who has violated section 501(a) in order to recover damages or secure other appropriate relief "for the benefit of the labor organization." 29 U.S.C. § 501(b). Plaintiffs bring their claim under section 501(b) seeking: (1) an injunction prohibiting the individual defendants from breaching their fiduciary duties to ALPA by failing to implement the Fragmentation Policy and (2) recovery of ALPA funds expended by the individual defendants in the course of breaching their fiduciary duties.[16]

In section 501 suits, the plaintiff sues derivatively "for the benefit of the labor organization." 29 U.S.C. § 501(b); *see also Building Material and Dump Truck Drivers, Local 420 v. Traweek*, 867 F.2d 500, 506 (9th Cir.1989) (Plaintiff in section 501 suit "acts in a representative capacity for the benefit of the union and on behalf of the union. [Plaintiff] cannot seek to recover damages personally, but must seek a remedy for the union as a whole."). Bearing this in mind, and in light of the Court's disposition of Count I, it is clear that Count V also must fail.

As shown in the foregoing discussion, ALPA complied with the literal terms of its Fragmentation Policy in connection with every transaction at issue in this lawsuit. Thus, the Union as a whole has no claim that any individual defendant violated a fiduciary duty by failing to implement union policy. Plaintiffs can assert no derivative claim on behalf of ALPA, because ALPA itself has no claim against its officials.

---

disappointing results from the Eastern pilots' perspective. The remaining "promises" were simply too vague to represent commitments, the breach of which would constitute a violation of the duty of fair representation. Thus, promises by President Duffy to the Eastern pilots that they would transfer "with the jobs and with the equipment" or that "We are going to make every effort to be sure that Eastern pilots [transfer with seniority]" added nothing to the express commitments set forth in ALPA Fragmentation Policy as to ALPA's obligations in a fragmentation situation. Similarly, the "press releases" issued by ALPA purported only to relate the actions of the ALPA Executive Committee. Thus, to the extent that the press releases expressed commitments different from, and more expansive than, the commitments expressly adopted by the Executive Committee, it was not reasonable for plaintiffs to rely on these statements as "promises" made by the ALPA leadership. Even if any of these "promises" could be construed as an enforceable commitment by ALPA to the plaintiffs, plaintiffs have produced no evidence to indicate that the promises were "intentionally misleading" so as to constitute "bad faith" as required in connection with the duty of fair representation.

**16.** The Court assumes, without deciding, that section 501 imposes broad fiduciary duties on union officials in all their functions and is not limited to situations implicating the officials' custodianship of the "money and property" of the union. *See, e.g., Stelling v. International Brotherhood of Electrical Workers, AFL–CIO*, 587 F.2d 1379, 1385–87 (9th Cir.1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979); *Richardson v. National Post Office Mail Handlers*, 442 F.Supp. 193, 195 (E.D.Va.1977), *remanded without opinion*, 612 F.2d 1309 (4th Cir.1979). *But see, e.g., Gurton v. Arons*, 339 F.2d 371, 375 (2nd Cir.1964) (section 501 applies only when monetary interest of union is involved). The Fourth Circuit has not yet addressed this issue.

There is no question that plaintiffs have produced competent evidence that supports the inference that some MEC Chairmen took actions contrary to plaintiffs' interest in vigorous implementation of the Fragmentation Policy. Such evidence is not, however, sufficient by itself to support an action under section 501. Instead, section 501 requires a showing that the union itself suffered harm. As long as a union leadership remains in compliance with the union's internal policies, then the union itself suffers no harm, even if subgroups within the union are disadvantaged. A contrary holding would lead to untenable results whenever, as here, a union appointed officials to represent discrete subgroups of its membership. Without a requirement that the union as a whole be harmed, the loser of any internal union dispute could always sue the representatives of the winners, alleging breach of fiduciary duty under section 501 for taking a position contrary to the loser's interests. That is plainly not the law, and accordingly, plaintiffs cannot sue members of the ALPA leadership merely because they advocated positions, not in violation of ALPA's internal policies, that were contrary to the interests of the subgroup to which plaintiffs belonged. Consequently, summary judgment is appropriate with respect to Count V of the complaint.

## VII.

In Count VI of the complaint, plaintiffs allege that ALPA imposed a custodianship over the Eastern MEC in violation of 29 U.S.C. § 462. Plaintiffs contend that the custodianship was imposed to silence the Eastern MEC and to replace its leadership with a custodian sympathetic to the aims of the ALPA leadership.

Section 462 provides:

Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

29 U.S.C. § 462. ALPA's constitution authorizes ALPA "to take emergency action to provide representation for the pilots in the service of any airline which interrupts or ceases all or substantially all operations or which is conducting operations after filing of bankruptcy or reorganization proceedings or pending liquidation ..." Pl. Dep. 1, Art. XXI, Sec. 1. Federal law further provides that:

a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws ... shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462....

29 U.S.C. § 464.

The threshold question, therefore, is whether the custodianship over the Eastern MEC was imposed in conformity with ALPA's constitution. Plaintiffs argue that, because the custodianship provision of the constitution authorizes ALPA "to take emergency action to provide representation" for pilots at a troubled airline, ALPA may only impose a custodianship when pilots at a troubled airline are not receiving adequate representation from their MEC. This argument runs counter to a plain reading of the ALPA constitution, which authorizes a custodianship over an MEC at "any airline" which has ceased operations or filed a bankruptcy petition. Contrary to plaintiffs' contention, the constitution does not require a preliminary showing that the pilots at a troubled airline were receiving inadequate representation prior to the imposition of the custodianship. Defendants correctly point out that it is the cessation of operations or the filing of a bankruptcy petition that is the sole triggering event for ALPA's authority, not the lapse

in the representational functions at the affected MEC.[17]

Because the custodianship was imposed in conformity with ALPA's constitution, ALPA gains the benefit of the presumption of validity pursuant to 29 U.S.C. § 462. Accordingly, plaintiffs can challenge the validity of the custodianship only by "clear and convincing" evidence that the custodianship was not established for a legitimate purpose. Plaintiffs have presented *no* evidence that the custodianship was imposed for an impermissible purpose, other than to dispute ALPA's purported legitimate reasons for imposition of the custodianship.[18] Even if all factual disputes are resolved in plaintiffs' favor, and ALPA's proffered rationale is entirely discredited, there is still no affirmative evidence that ALPA's actions were motivated by impermissible concerns. Plaintiffs must rely exclusively on the negative inference, arising from the lack of a legitimate purpose, to establish that ALPA acted with an illegitimate motivation. No reasonable fact-finder could, solely on the basis of this negative inference, find that plaintiffs had satisfied their burden of proving an illicit motive by "clear and convincing" evidence. Summary judgment is therefore appropriate on Count VI of the complaint. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512 (Court should consider "substantive evidentiary standard of proof that would apply at the trial on the merits" when assessing motion for summary judgment).

## VIII.

For the foregoing reasons, the Court holds that summary judgment must be entered on all of plaintiffs' remaining claims. An appropriate order has issued.

---

17. Defendants note that a custodianship has been created over the MEC at every ALPA carrier that has filed for bankruptcy and terminated commercial flight operations since this provision was added to the ALPA constitution in 1984.

18. ALPA contends that the custodianship was imposed for the purpose of "restoring democratic procedures" at the Eastern MEC and "other-

wise carrying out the legitimate objects of [the] labor organization." 29 U.S.C. § 462. Specifically, ALPA claims that MEC and Local Council elections had not been held within the Eastern MEC, that accurate membership rosters had not been maintained, and that the Eastern MEC had not retained adequate control over its finances.