**Daniel FORD, Jesse Ashcraft, and Kent Dobbins, Plaintiffs,**

v.

**AIR LINE PILOTS ASSOCIATION INTERNATIONAL, and Duane E. Woerth, as President of Air Line Pilots Association, International, Defendants.**

**No. 01–CV–2800 ILG.**

United States District Court, E.D. New York.

June 23, 2003.

Michael S. Haber, Esq, New York City, for Plaintiffs.

Michael E. Abram, Esq., Cohen, Weiss & Simon LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### SUMMARY

This action results from a dispute between certain pilots for Comair, Inc. ("Comair"), an airline company that contracts with its parent company Delta Air Lines to fly part of Delta's routes, and their union, the Air Line Pilots Association ("ALPA") and its President, Duane E. Woerth (together, "Defendants"). Plaintiffs assert that Defendants, who represent the pilots for both Comair and Delta, breached their duties to Comair's pilots when they negotiated a collective bargaining agreement on behalf of Delta pilots that restricts the number and type of flights that Comair may fly. Plaintiffs also assert that Defendants breached their duties by failing to process plaintiffs' grievances regarding these issues.

Defendants move to dismiss the case for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants first assert that plaintiffs' claims, although clothed as tort and contract claims, are in fact representational disputes that lie wholly within the jurisdiction of the National Mediation Board, and that this court therefore lacks subject matter jurisdiction. Defendants then claim that even if this court may assert jurisdiction, the complaint fails to state a cause of action because a union's duty of fair representation does not require ALPA to incorporate Comair pilot concerns when negotiating on behalf of Delta pilots, nor does that duty extend to plaintiffs' claims regarding ALPA's failure to process the pilots' internal grievances filed about this issue since ALPA's long-standing interpretation of its own Constitution and By–Laws limits the grievance process to disciplinary actions. Defendants then argue that plaintiffs' claims are moot, that the state law claims are preempted by federal law, and that the claims under the Labor Management Reporting and Disclosure Act ("LMRDA") also fail to state a claim.

Plaintiffs oppose the motion to dismiss and also move for leave to amend the complaint to include over three hundred other Comair pilots as named plaintiffs, pursuant to Federal Rules of Civil Procedure 15 and 21. The proposed amended complaint does not seek to change any of the substantive allegations. Defendants oppose the motion on the grounds that if the original complaint fails to state a cause of action, it would be futile to add new plaintiffs.

For the reasons stated herein, Plaintiffs have sufficiently stated a claim that ALPA breached its duty of fair representation by allegedly negotiating contracts that arbitrarily favor the Delta pilots over the Comair pilots. Plaintiffs' other claims, however, are dismissed because they either are preempted by the federal duty of fair representation claim, involve a long-standing interpretation of ALPA's own Constitution and By–Laws that is not patently unreasonable, or do not involve similarly situated persons for purposes of the LMRDA. The motion to amend is treated separately at the end of this memorandum.

## BACKGROUND [1]

According to the Complaint, Plaintiffs Daniel Ford, Jesse Ashcraft, and Kent Dobbins are pilots employed by Comair. ALPA is a labor union that represents pilots at almost fifty carriers, including Delta and Comair, and therefore represents plaintiffs.[2]

### Comair, Delta and the Use of Regional Jets in the Airline Industry

Delta acquired Comair in January 2000, and Comair is now part of Delta's wholly owned subsidiary Delta Connection, Inc. Marketing material refers to Comair as the "Delta Connection," providing connecting flights from certain cities within a few hundred miles of certain Delta hubs, such as the Cincinnati/Northern Kentucky International Airport. Comair also provides direct service on some of Delta's routes at those times of the day for which there is insufficient demand to fill larger aircraft. Comair has approximately 1,400 pilots, while Delta has approximately 10,000 pilots.

Beginning in the early 1990's, Comair pioneered the use of regional jets in North America. Prior to the introduction of regional jets, regional carriers like Comair typically used planes with turbine engines that powered propellers ("turbo-props"). Turbo-props are smaller, slower and less comfortable for passengers than regional jets. Regional jets, such as those used by Comair, reach speeds comparable to those attained by larger, conventional jet airplanes. Regional jets today can be configured to hold 70 or even 90 passengers and fulfill roles similar to those that smaller conventional jets traditionally filled.

In a January 2000 report entitled "Regional Jets and the Delta Network," Delta stated that regional jets "fuel" mainline Delta by providing more than $1 billion in revenue, and feed mainline Delta through increased passenger loads. According to the report, without its regional carriers

---

1. Except where noted, the facts described here are as alleged, since those allegations must be taken as true for purposes of a motion to dismiss under Rules 12(b)(1) and (b)(6).

2. Although not mentioned in the Complaint, the Court notes that during the 1990's ALPA assessed dues and agency fees in a manner that requires employees at one carrier to pay a share of the chargeable expenses incurred on behalf of employees of another collective bargaining unit, even though the expenses were for activities not performed for the direct benefit of the employees charged. *See Lancaster v. ALPA,* 76 F.3d 1509 (10th Cir. 1996), *abrogated on other grounds by ALPA v.*

*Miller,* 523 U.S. 866, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998); *Crawford v. ALPA Int'l,* 992 F.2d 1295 (4th Cir.1993) (en banc); *Pilots Against Illegal Dues v. ALPA,* 938 F.2d 1123 (10th Cir.1991). In approving the charging of such expenditures to pilots at bargaining units other than the ones benefitted, courts have placed great importance on ALPA's "unified-membership structure," *Crawford,* 992 F.2d at 1300, and have noted how "[t]he direct impact of bargaining at one airline on bargaining at other airlines may be the result both of the somewhat unique organizational structure of ALPA and of the national nature of the industry." *Id.* at 1303 n. 1 (Wilkinson, J., concurring).

(like Comair), Delta's annual revenue ranking as compared with other airlines would decrease from first to third. Without Comair, Delta's operations in Cincinnati would suffer so dramatically that the hub would become unprofitable.

Comair has the largest fleet of regional jets in the nation. Comair and other subsidiaries of Delta[3] either have or until recently had orders or options to obtain approximately 500 additional regional jets, including 170 CL–700's, a new regional jet that can accommodate 70 passengers. Although the Complaint is not entirely clear on this point, it appears that Delta itself does not utilize regional jets, but instead uses only larger conventional or "mainline" jet planes. According to plaintiffs, because the regional carriers like Comair have contributed so significantly to the airline industry, tension has grown between the pilots of regional carriers and their mainline counterparts.

### The Collective Bargaining Agreement Process

In addition to a national office, ALPA has established a "Master Executive Council" ("MEC") for each airline at which it represents employees. The MEC for each airline serves as the coordinating council for ALPA members at that airline. For example, the Comair MEC is empowered to take actions on the concerns of Comair pilots, including conducting collective bargaining activities with Comair management. The Delta MEC similarly is empowered to take actions on the concerns of Delta pilots, including conducting collective bargaining activities with Delta management. In the course of contract negotiations between ALPA and a carrier such as Comair or Delta, the respective MEC participates in the negotiation along with rep-

resentatives from ALPA's national office. ALPA's national office provides an array of assistance, support and coordination to the pilot membership at each carrier.

A collective bargaining agreement ("CBA") between ALPA and a respective carrier usually has a "scope" clause. This scope clause defines and describes the application of the CBA in terms of the activity that is covered. The Delta CBA in effect when the Complaint was filed states that it applies to "all flying performed by or for the Company or any Affiliate," meaning Delta itself or any subsidiary (which, therefore, includes Comair). The Delta scope clause further provides that it applies to all flying of aircrafts with more than 70 seats, and thus purportedly prevents Comair pilots from flying aircraft of more than 70 seats.

### ALPA's Purported Efforts to Harm Comair Pilots

In 2000, Delta and ALPA were negotiating a new CBA, toward which end they reached a tentative agreement. ALPA sought to broaden the scope clause in the Delta CBA to impose further restrictions on both the type of aircraft Comair may fly and other matters that directly affect the career potentials of Comair pilots. Plaintiffs allege that ALPA's efforts to broaden the Delta scope clause is "waging economic war" on the regional jet. Plaintiffs point to a number of statements that allegedly demonstrate ALPA's intent in this regard.

For example, in October 1999 Defendant Woerth testified before a subcommittee of the House of Representatives Committee on Transportation and Infrastructure that "the growth of the Regional Jet industry" was one of the new "challenges" contribut-

---

**3.** The complaint frequently fails to distinguish between Comair and its parent Delta Connection. The Court will presume that the two are

interchangeable for all purposes relevant to this motion to dismiss.

ing to flight delays and "among the newest threats" to airport capacity.[4] Woerth is also alleged to have publicly stated that "circumstances require that 70–seat equipment be flown by mainline pilots at mainline rates." Plaintiffs allege that by these statements, Woerth indicated that ALPA will use its resources to see that opportunities for growth are redirected toward the mainline air carriers like Delta. Plaintiffs contend that ALPA will support Delta's efforts to place orders for the RJ–700 aircraft, for which orders already exist at Comair and Atlantic Southeast Air Lines, another carrier that is part of the Delta Connection.

The Winter 2000 issue of "The Widget," a Delta MEC publication, declared that regional jets "pose a threat to mainline pilots" and emphasized "our need to ensure that the RJ assets are used to complement mainline flying and not dismantle it[.]" The Widget article outlined a series of protective measures that could be taken to serve the interests of Delta pilots, including setting floors for the number of aircraft or hours of flying, limiting aircraft size and seat configurations, fixing ratios of the number of regional jets to mainline jets, and restricting the use of Delta Connection flights for hub-to-hub routes. If Comair expands its fleet of regional jets, these proposed ratios allegedly will impose the equivalent of a tariff on each new regional jet since Delta would need to purchase additional mainline aircraft to maintain the ratio.[5] If Delta needs to reduce the size of its mainline fleet, these proposed ratios would force Comair to reduce its flight operations to maintain the ratio. In other words, under a ratio formula, if Delta performs poorly and is required to shrink its fleet or number of flights, then Delta would also have to cause Comair to shrink its fleet or number of flights to keep within the ratio proposed by ALPA.

In October 2000, the Delta MEC's Negotiating Committee listed its objectives for the upcoming negotiations with Delta. These objectives included restricting Comair flying to 50–passenger jets, tying Comair growth to Delta mainline growth, prohibiting Comair substitutions for profitable mainline flying, requiring a high proportion of Comair flights to feed Delta hubs, restricting the length of Comair flights, and restricting Comair from operating mainline aircraft. These objectives would, plaintiffs allege, prevent Comair pilots from flying new, larger regional jets for which Comair had already contracted, limit the expansion of career growth opportunities for Comair pilots and negatively affect their earnings. Plaintiffs allege that these objectives were formulated by the Delta MEC in consultation with ALPA, and to achieve these objectives the Delta MEC was "wholly dependent upon negotiations conducted by ALPA ...." (Compl.¶ 92.)

### The Delta CBA

Plaintiffs allege that their fears have been realized. The agreement reached between ALPA and Delta in 2001 provides a

---

4. Although not mentioned in the complaint, Defendants note that Woerth's testimony (publicly available at http://www.house.gov/transportation/aviation/hearing/10–14–99/woerth.html, as well as 1999 WL 824976 (Oct. 14, 1999)) involved generally the challenges to the national air traffic capacity. *See id.* at 1 ("We appreciate the opportunity to appear before you today to discuss the very complex issues of air traffic control delays and system safety.")

5. Presumably since Comair is a wholly-owned subsidiary of Delta Connection and thus of Delta, Delta could cause Comair to refrain from expanding (or even shrink) its fleet of regional jets if such purchases would impose external costs on the parent company.

complex variable formula that generally limits the flying of regional jets by Delta Connection carriers (and thus limits the flying done by Comair pilots) by creating a ratio of regional jets to Delta's mainline jets. Plaintiffs further allege that a reduction in flying at Comair would force Delta to spend hundreds of millions or billions of dollars more at mainline Delta, which would in turn curtail resources for Comair's growth.[6]

Defendants note that the 2001 CBA specifically provided that the ratios would be suspended depending upon certain economic circumstances and that the ratios were in fact suspended due to the economic dislocations caused by the attacks of September 11, 2001. However, on November 21, 2002, Delta and ALPA executed a revision of the 2001 CBA that reset the ratios and is now in effect.

Despite allegedly encouraging and engineering the restrictions on regional jet growth sought by the Delta MEC, ALPA has taken no substantive steps "to assure [that] its constituency at Comair" is aware of or insulated from the Delta MEC's objectives, nor has it taken any steps to include Comair pilots in these negotiations that "overwhelmingly affect[ ]" the "career potentials and ambitions" of Comair pilots. (Compl.¶ 101, 104.) ALPA allegedly has refused to consider the economic impact that the proposed restrictions on Comair's growth will have on Comair pilots. Plaintiffs allege that ALPA also has refused requests by Comair representatives to participate in collective bargaining negotiations between Delta and ALPA.

### ALPA's Constitution and By–Laws

Under its Constitution and By–Laws, ALPA's stated goal is to "establish fair rates of compensation, maximum hours of employment, and uniform principles of seniority for members of the Association, and to seek the adoption and perpetuation thereof," to "provide a means for participation by members of the Association in resolution of issues that affect the piloting profession," and to "provide motivation for [all members and employees of the Association] to strive for the best of which they are capable." (ALPA Const. Art. I, § 6.B(6), (9) and (16).) The "representation of all members of the Association at any duly called meeting of the Board of Directors, Executive Board and Master Executive Council is mandatory. Elected representatives may be considered as acting against the best interest of the Association if they fail to represent, or arrange for representation of their constituents." (*Id.*, Art. I, § 14.) Any member of ALPA may be disciplined (up to and including expulsion) if they act "in any manner to circumvent, defeat or interfere with collective bargaining between the Association and an employer or with collective bargaining agreements." (*Id.*, Art. VIII, § 1.A(9).) ALPA's rules of membership expressly prohibit any member from "doing any act contrary to the best interests of the Association or its members." (*Id.*, Art. VIII, § 1.A(10).) The ALPA Constitution and By–Laws also provide that any member having a dispute with ALPA concerning interpretation of the Constitution and By–Laws or of policies adopted by the Board of Directors is entitled to a hearing before an ALPA hearing board and to appeal, if necessary, to an ALPA Appeal Board.

Plaintiffs allege that, in violation of the ALPA Constitution and its By–Laws, ALPA has permitted the Delta MEC to

---

**6.** Plaintiffs' complaint fails to provide an explanation for why Delta would make such expenditures.

usurp powers reserved for its governing bodies, and has permitted and actively encouraged the Delta MEC to negotiate terms and restrictions that adversely affect Comair pilots. Plaintiffs further allege that by denying Comair pilots the right to negotiate these matters that affect them, ALPA violated its Constitution and By–Laws.

### Plaintiffs' Filing of Grievances with ALPA

Plaintiffs filed grievances in January 2001 with ALPA contending that the union had failed to treat its members equally and without discrimination by supporting the Delta MEC's efforts to impose restrictions on Comair, by negotiating a side letter agreement that would permit Delta employees to join Comair while retaining Delta seniority and longevity, and by permitting the Delta MEC to negotiate matters outside its customary ambit. These grievances requested expedited handling. Plaintiffs allege that to date ALPA has taken no action with regard to the grievances. Defendants note that plaintiffs are aware that ALPA in fact did respond to these grievances and declined to process them pursuant to a long-standing interpretation of the ALPA Constitution and By–Laws limiting the scope of grievances.

### Plaintiffs' Claims for Relief

Plaintiffs first claim that ALPA's efforts on behalf of the Delta pilots at the expense of Comair pilots constitutes a breach of the duty of fair representation because they are arbitrary, discriminatory and taken in bad faith. Plaintiffs thus seek an injunction ordering ALPA (a) to stop withholding information from Comair pilots concerning proposals to broaden the scope clause in the Delta CBA that could prevent, limit, or restrict flying by Comair pilots; (b) to stop assisting Delta pilot negotiators that seek to minimize flying done by Comair pilots or restrict Comair pilots to aircraft smaller than that which is called for in Comair's marketing and business plans; (c) to stop excluding Comair pilots from participating in Delta negotiations in which Comair pilots' career potentials and ambitions may be directly affected; (d) to stop "continuing to permit circumstances in which representatives of ALPA's national office who assist Delta pilot negotiators are not privy to information concerning negotiations on behalf of Comair pilots," (e) to stop negotiating or assisting in the negotiation of scope clauses in such a manner as to exercise control over the flying by pilots for a carrier other than the one for which the CBA is being negotiated, and (f) to stop approving or implementing those portions of the tentative agreement that would impose restrictions on flying by Comair. Plaintiffs' second and third claims for relief seek the same injunction based on the alleged breach of ALPA's Constitution and By–Laws, and its alleged breach of fiduciary duty owed to the plaintiffs as members of the union.

In their fourth, fifth and sixth claims for relief, plaintiffs allege that ALPA, by its failure to process, let alone expeditiously, these grievances, has breached its duty of fair representation, violated its Constitution and By–Laws, and breached its fiduciary duties, and seek money damages, including punitive damages, as a result. In their seventh, eighth and ninth claims for relief, plaintiffs claim that ALPA's failure to convene a hearing board constitutes a breach of its duty of fair representation, a violation of the ALPA's Constitution and By–Laws, and a breach of its fiduciary duty.

Finally, plaintiffs also claim that by excluding Comair pilots from participating in deliberations that directly affect their rights, privileges, employment opportunities and career objectives, ALPA has

breached its duties to them and denied them their rights under section 411 of the LMRDA. As relief for this alleged breach of the LMRDA, plaintiffs seek the same injunctive relief described above.

## STANDARD FOR MOTION TO DISMISS

When deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must take all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiffs. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Phelps v. Kapnolas,* 308 F.3d 180, 184 (2d Cir.2002). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *FD Property Holding, Inc. v. U.S. Traffic Corp.,* 206 F.Supp.2d 362, 369 (E.D.N.Y. 2002) (internal quotation marks omitted). However, the Court may consider matters of public record, such as court decisions, statutes, and documents such as briefs filed with courts and other public bodies. *See, e.g., Papasan v. Allain,* 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir.2000).

A complaint is properly dismissed under Fed.R.Civ.P. 12(b)(1) if the court lacks subject matter jurisdiction over plaintiffs' claims. "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. But where evidence relevant to the jurisdictional question is before the court, the district court may refer to that evidence." *Robinson v. Government of Malaysia,* 269 F.3d 133, 140 (2d Cir.2001) (quotations and alterations omitted).

## DISCUSSION

### I. Subject Matter Jurisdiction

█ Under the Railway Labor Act ("RLA"),

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify ... the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified ....

45 U.S.C. § 152, Ninth.

█ The National Mediation Board ("NMB") decides who should represent a carrier's employees belonging to a certain craft or class. The power to decide these representational issues belongs exclusively to the NMB. *See Switchmen's Union v. NMB,* 320 U.S. 297, 301, 64 S.Ct. 95, 88 L.Ed. 61 (1943). The Board's exclusive jurisdiction extends to determine whether two related carriers, such as a parent and subsidiary, are functionally a single carrier. *See ALPA v. Texas Int'l Airlines,* 656 F.2d 16 (2d Cir.1981). The parties do not dispute that Delta and Comair are separate carriers under the RLA.

In other contexts, the Second Circuit had held that whenever an RLA representational dispute "appears on the face of the complaint, even in the absence of a challenge by a competing union or an application to the NMB, the court is bound to dismiss the action." *ALPA v. Texas Int'l,* 656 F.2d at 24. In that case, a carrier (TXI), whose pilots were represented by

ALPA, underwent corporate restructuring to create a sister corporation (New York Air) to serve the New York–Washington, D.C., route previously handled by TXI. *Id.* at 17. When New York Air refused to recognize ALPA as the representative of the pilots employed by it, ALPA brought suit to order New York Air to deal exclusively with ALPA and to stop operating except in accordance with the existing CBA between ALPA and New York Air's predecessor, TXI. *Id.* at 18. Although the injunctive relief sought was broader than simply declaring that ALPA was the proper representative of the New York Air pilots, such a representational determination was essential to resolving ALPA's claims, and therefore the NMB's exclusive jurisdiction was triggered. *Id.* at 24.

The issue of representational disputes appears frequently in the context of airline mergers and acquisitions between carriers whose employees are represented by different unions or by no union at all. The union representing the acquiror's employees often will assert that the CBA between those employees and the acquiror governs the terms for performing the same class of work at the acquired carrier, including determining who has seniority. In opposition, the acquired carrier will claim that the work falls outside the scope of the CBA since the union does not represent the employees at the newly-acquired carrier. In order to resolve such a dispute, a court would need to determine whether the union actually represents the group of employees at the acquired carrier—a rep-

resentational dispute wholly within the jurisdiction of the NMB. *See Independent Union of Flight Attendants v. Pan American World Airways, Inc.,* 664 F.Supp. 156 (S.D.N.Y.1987), *aff'd,* 836 F.2d 130 (2d Cir. 1988) (holding that dispute between Pan Am World and union over application of Pan Am World's CBA to recently acquired sister airline must be dismissed because NMB has exclusive jurisdiction to determine whether airlines should be treated as a single carrier); *Flight Engineers' Int'l Assoc. v. Pan American World Airways, Inc.,* 716 F.Supp. 110 (S.D.N.Y.1989), *aff'd,* 896 F.2d 672 (2d Cir.1990) (applying same analysis to dismiss claim by union for money damages based on parent's refusal to appoint flight instructors represented by union to train personnel at acquired airline).

Defendants argue that plaintiffs seek broad sweeping changes that in essence will integrate Comair pilots and Delta pilots into a single negotiating unit with Delta. Defendants claim that "the only way plaintiffs' alleged 'conflict' [between representing the Delta pilots and representing the Comair pilots] could be 'purged' is by restructuring representation rights: if the NMB required ALPA and all the Delta Connection carriers to negotiate jointly with respect to all of their pilots or if ALPA were replaced as the Comair pilots' representative by a union representing no other pilot groups." (Def. Reply Mem. at 6.) [7]

On the other hand, plaintiffs contend that this case is not a merger case like

---

**7.** In passing, Defendants raise the specter of "substantial disruptive effects" caused by a ruling in favor of plaintiffs that would require all the Delta Connection carriers and Delta to negotiate jointly with each craft or class. (Def. Reply Mem. at 6 n. 7) However, plaintiffs' claims are not so broad as to demand "joint negotiations," nor would a ruling for plaintiffs require changing the negotiations

for other Delta Connection carriers unless ALPA sought to negotiate CBAs that harmed the employees at Delta Connection carriers *also represented by ALPA.* Where the pilots at Delta Connection carriers are represented by other unions or by no union at all, then by definition ALPA cannot breach any duty of fair representation.

*Texas Int'l* or the *Pan American* cases because there is no dispute over who is the proper representative for either Delta pilots or Comair pilots—ALPA is certified to represent both groups. Plaintiffs argue that the issue is thus not who should represent the pilots, but rather whether a certified representative may negotiate agreements on behalf of one bargaining unit that directly and negatively impact another bargaining unit. Put differently, if it is correct that a union's relationship to its members is that of a fiduciary, then it would follow that it runs afoul of its fiduciary obligation to one master by favoring another to the detriment of the first. *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) ("The bargaining representative . . . is responsible to, and owes complete loyalty, to the interest of all whom it represents."); *Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 75, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) ("The duty of fair representation is . . . akin to the duty owed by other fiduciaries to their beneficiaries.").

Plaintiffs are correct. This case differs from the merger cases and the principles upon which defendants rely in two significant ways. First, plaintiffs do not want to oust the Delta MEC from representing Delta pilots, nor do they seek to have Delta and Comair CBAs jointly negotiated. Rather, plaintiffs seek to enjoin ALPA (their certified representative) from taking certain actions that allegedly violate the duties owed to plaintiffs and other Comair pilots. The very basis of plaintiffs' claims is that because ALPA represents both Delta pilots and Comair pilots, it stands in a fiduciary relationship to both groups.

Second, plaintiffs' case is different from the representational cases because it is not a dispute between ALPA and Delta or Comair. There is no evidence that Delta or Comair would refuse to treat with ALPA if plaintiffs prevail. Instead, plaintiffs take issue with the conduct (not the identity) of their representative. ALPA points to no case finding that the NMB has exclusive jurisdiction, or indeed any jurisdiction, over such a dispute.

Indeed, a case which defendants mention in support of their argument (albeit in passing) demonstrates why the present case does not fall within the exclusive jurisdiction of the NMB. In *Hester v. Brotherhood of Railroad Trainmen,* 206 F.2d 279 (8th Cir.1953), the Santa Fe Railroad had engaged the Railway Express Agency for decades in a joint service arrangement that provided in part that messenger-baggagemen jointly employed by the two companies would handle express baggage, mail, correspondence, and similar items ("express"). *Id.* at 280. Otherwise, Santa Fe had agreed with its own brakemen that "all vacancies occurring in baggage runs not controlled by joint service shall be filled from the ranks of * * * brakemen." *Id.* (ellipsis in original). The messenger-baggagemen who handled express were represented by one union, the Brotherhood of Railway and Steamship Clerks, while the Santa Fe brakemen were represented by another union, the Brotherhood of Railroad Trainmen (the "BRT"). *Id.* The BRT attempted to obtain and enforce an award by the National Railroad Adjustment Board shifting the joint service work performed by the messenger-baggagemen to the brakemen. *Id.* at 281. Following this action by the BRT, four messenger-baggagemen brought an action for money damages against the BRT based on the contention that the BRT "is the collective bargaining representative for both brakemen and baggagemen on the Santa Fe System," a claim which was clearly disputed by both the BRT and the historical record. *Id.* at 281–82. The Eighth Circuit held that the district court correctly dismissed the complaint for lack of jurisdic-

tion, since "until the plaintiffs have sought and obtained from the Mediation Board such an establishment of their claimed and disputed craft status, they necessarily are without any foundation in the situation for legally sustaining the critical allegation on which their suit is attempted to be rested." *Id.* at 282. In the present case, however, the "critical allegation" that ALPA represents both the plaintiffs and the Delta pilots is beyond cavil. When there is no doubt that the same union represents all employees involved, there can be no representational dispute.

Accordingly, this Court has jurisdiction over this case.

## II. Mootness

■■■■ Defendants argue in their papers that since the ratios implemented by the 2001 CBA were suspended because of the economic dislocation in the airline industry following the attacks of September 11, 2001, plaintiffs' claims are moot. "A case is moot when 'it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, [and] interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Associated Gen. Contractors of Conn. v. City of New Haven*, 41 F.3d 62, 66–67 (2d Cir.1994) (*quoting County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). Since Defendants candidly admit that ALPA is "obligated to engage in talks to 'reset' the limits in light of current circumstances," (Def. Mem. at 24), it cannot be said with very much assurance at all that there is no reasonable expectation that plaintiffs' allegations are moot. After oral argument, Defendants confirmed that the restrictions had been reset pursuant to an agreement executed on November 21, 2002. (Migliore Dec., Ex. A.) Accordingly, this case is not moot.

## III. The Duty of Fair Representation Claim

■■■■ Broadly stated, a union has a duty to represent fairly all its members. " 'The exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power to act in their interest and behalf.' " *O'Neill*, 499 U.S. at 74, 111 S.Ct. 1127 (quoting *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944)). The duty of fair representation "applies to all union activity, including contract negotiation." *Id.*, 499 U.S. at 67, 111 S.Ct. 1127. "The bargaining representative . . . is responsible to, and owes complete loyalty, to the interests of all whom it represents." *Ford Motor*, 345 U.S. at 338, 73 S.Ct. 681. A union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith." *Id.; see Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

Before examining the specific claims asserted by plaintiffs, it is worth noting the colloquy that passed between the Court of Appeals for the Tenth Circuit and counsel for the United Auto Workers ("UAW") in *National Labor Relations Board v. Customized Transportation, Inc.*, 948 F.2d 1294, 138 L.R.R.M. (BNA) 2976, 1991 WL 240142 (10th Cir.1991) (unpublished opinion), a case which neither party cites. The Court of Appeals in *Customized Transportation* had reason to address the risk that a union at one company might use its bargaining strength to prevent the company from outsourcing production to other companies whose workers are represented by the same union. The UAW had won an election to represent the workers at Customized Transportation, Inc. ("Customized" or "CTI"), a company that performed outsourcing work for General Motors, whose employees were also represented by

the UAW. *Id.*, 948 F.2d 1294, 1991 WL 240142 at *1. Customized refused to bargain with the UAW, citing the perceived conflict of interest between the GM employees (who would seek to reduce or eliminate outsourcing) and its employees (whose livelihood depended upon such outsourcing). *Id.* at *1–2. In affirming the National Labor Relation Board's certification of the UAW as the bargaining representative for Customized and enforcing the Board's order that Customized bargain with UAW, the Court of Appeals specifically noted and took comfort from the following exchange with counsel for UAW (appearing as an intervenor):

> COURT: I just want to know whether you are going to expose your clients to a breach of fair representation. [If the UAW took a position against GM's continuing outsourcing of work to CTI while negotiating on behalf of either CTI's employees or GM's Fairfax plant employees.]
>
> COUNSEL: I am. The answer to that question is yes.
>
> COURT: And that's on both sides of the equation?
>
> COUNSEL: That is correct.
>
> COURT: If they have an ulterior motive in bargaining on the customized side, they open themselves up to a suit? If they have a motive on bargaining on the Fairfax plant side to destroy [C]ustomized, they also open themselves up to a suit?
>
> COUNSEL: In my view that is inconsistent with the Union's duty of fair representation. That is bad faith, arbitrary, or irrational conduct by the Union, and it would be susceptible to our employees on the facts as you stated them.

*Id.* at *3–4. In a footnote to that colloquy, the Court noted, "We do not decide here how extensive may be UAW's duty of loyalty to its CTI employees, nor whether it would, as a matter of law, extend to its conduct which [*sic* ] acting as a bargaining agent for GM employees. Any discussion of such issues should wait a specific factual context." *Id.* at *3 n. 4. Although *Customized Transport* only touches upon the issue, this colloquy highlights the very problem presented by this case: if a union negotiates concessions for the sole benefit of its members at one company that will cause significant harm to union members at a second company, can the second group claim that the union breached its duty of fair representation? Given the allegations here that ALPA acted arbitrarily, discriminatorily, or in bad faith and unreasonably in negotiating the Delta CBA, the answer in this case is that plaintiffs have stated a claim for relief.

## A. Judicial Review of Union Representation of Its Members

Defendants seek to dismiss Claim I, which seeks injunctive relief based on an alleged breach of the duty of fair representation relating to the negotiation of terms in the scope clause in the Delta CBA that affect Comair pilots. Defendants argue that ALPA's constitutional structure, which delegates to each MEC the authority to negotiate the contract with the respective carrier, cannot be considered "arbitrary, discriminatory or in bad faith" as a matter of law. Each MEC negotiates to protect the interests of the union members employed by the respective carrier. However, plaintiffs do not seek to force the Delta MEC to do anything different, or to alter ALPA's constitutional structure. Plaintiffs seek injunctive relief, rather, to prohibit ALPA from assisting the Delta MEC to negotiate matters that directly and negatively affect plaintiffs' economic interests, and to prohibit ALPA from permitting such a CBA to take effect. Defendants' arguments that this relief chal-

lenges ALPA's constitutional structure are specious. The injunctive relief sought is clearly directed toward the ALPA national office, which even defendants admit "assist[s] each [MEC] group to negotiate for itself the best deal it can." Indeed, no collective bargaining agreement can be executed without the prior approval and signature of the President. (ALPA Const. (Rosen Decl., Ex. 1), Art. XVIII, § 1.)[8]

Defendants also argue that ALPA's long-established representative structure, applied uniformly across all pilot groups, cannot constitute discrimination or bad faith, and that plaintiffs' recourse should be to change ALPA's structure through their elected union representatives. This defense—that a union's internal political process is the only protection from inadequate representation for its members— was rejected by the Supreme Court in *O'Neill,* which supported review of the substantive conduct by a union to ensure that it falls within a wide range of reasonableness. *See id.,* 499 U.S. at 75–76, 111 S.Ct. 1127.

 Defendants next argue that like many large unions, ALPA represents a number of different employee groups with potentially differing interests and that therefore the resolution of conflicts between different groups cannot constitute a breach of the duty of fair representation. As defendants note, "conflict between employees represented by the same union is a recurring fact." *Humphrey v. Moore,* 375 U.S. 335, 349–50, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). The Supreme Court has noted the likelihood of conflict in the context of a challenge to the union's decision to compute seniority by including any military service during the Second World War:

Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected....

Compromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include differences based upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary.

*Ford Motor,* 345 U.S. at 338–39, 73 S.Ct. 681. In other words, unions can resolve competing interests among its members as long as that resolution falls within a "wide range of reasonableness ... subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Id.* at 338, 73 S.Ct. 681.

 Thus, "Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union." *O'Neill,* 499 U.S. at 78, 111

---

8. Moreover, it should be noted that the most recent CBAs with Comair and Delta both bear the signature of President (and defendant) Duane Woerth. (Rosen Decl., Ex. 2 (Comair CBA) at 30–3; Ex. 3 (Delta CBA), at 300.)

S.Ct. 1127. Defendants argue that consequently ALPA's dual obligations to both Delta pilots and Comair pilots cannot result in a breach of the duty of fair representation. This argument overstates the case, however, since even under the deferential level of review afforded union decisions, a court's review of union conduct extends to assuring that it was not arbitrary, discriminatory, or in bad faith. *Id.* at 67, 111 S.Ct. 1127. Plaintiffs here allege that ALPA's actions are all three.

■ Union conduct is arbitrary only where it may "be fairly characterized as so far outside a wide range of reasonableness that it is wholly irrational or arbitrary." *O'Neill,* 499 U.S. at 78, 111 S.Ct. 1127. Defendants argue that the Delta scope clauses "fall well within the wide range of reasonableness" given that scope and work preservation clauses are legitimate subjects of negotiation. (Def. Mem. at 18.) Defendants argue thus that the CBA is rational since it "furthers a legitimate interest in protecting pilot jobs, pay and work rules: it insures that Delta flying is performed by Delta pilots at Delta pay rates." (Def. Reply Mem. at 11.) Defendants note that these clauses are common in the industry and even exist within the Comair CBA governing plaintiffs' employment at Comair, but also concede that "[n]one of plaintiff's allegations ... detracts from its obvious intent to protect *Delta* pilot work opportunities." (*Id.* (emphasis added))

As Defendants note, the adoption of work preservation clauses can be a legitimate goal for a union to seek. *See, e.g., National Woodwork Mfrs Ass'n v. NLRB,* 386 U.S. 612, 646, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) (holding that carpenters' union could adopt "will not handle" rule forbidding handling of prefabricated doors in order to preserve work traditionally performed at jobsite). However, the notion that a union can impose rules that affect subsidiaries and affiliates has its limits. *See Berman Enters., Inc. v. Local 333, Int'l Longshoremen's Ass'n,* 644 F.2d 930, 936 (2d Cir.1981) (permitting clause that applied agreement to all work done by company and its affiliate where it was shown that "there was in reality but a single employer" that transferred employees back and forth between the two companies). These cases, however, did not resolve the issue presented here: whether a union can seek work preservation clauses that achieve their desired effect by restricting work opportunities for other members of the same union? As a matter of law such allegations are sufficient at least to state a claim.

■ Defendants' additional argument (which is not entirely clear to the Court) is that the Delta CBA actually benefits Comair pilots (or at least strikes an appropriate and rational balance) by increasing the proportion of total flying within the Delta system that could be conducted by Comair and other Delta Connection carriers, and that absent these ratios Comair could not perform any Delta flying. However, plaintiffs' allegations belie this argument, since they allege that the Delta CBA restricts the number and size of regional jets that Comair may have and that these restriction will cause harm to plaintiffs. Plaintiffs are surely correct that for purposes of a motion under Rule 12(b)(6), the factual issue of whether plaintiffs received any benefit, or to what extent, is best left for discovery and summary judgment (assuming that there would be no genuine issue as to any material fact).[9]

---

9. The Delta CBA reveals, moreover, that Defendants may be overreaching in this argument. The scope clause requires that "all flying performed by or for [Delta] *or any*

## B. The Limits of Fair Representation

Defendants point to a number of cases that support its position that a union's decision to implement policies that benefit some members over others are not breaches of the duty of fair representation. However, these cases usually arise in one of two contexts: (1) apportioning benefits among members of the same bargaining unit, *see, e.g., O'Neill, supra* (apportioning job openings between striking pilots and working pilots); *Ford Motor,* 345 U.S. at 330, 73 S.Ct. 681 (apportioning seniority rights among veterans); and (2) attempting to integrate union members from different bargaining units who have been laid off. *See, e.g., Humphrey, supra* (dovetailing seniority lists).

The first group of cases is clearly less analogous, since the "losing" employees at least have the ability to voice their dissent within the bargaining unit, and can often look forward to benefitting from the agreement. For example, the Seventh Circuit has held that it was not arbitrary, discriminatory or in bad faith for ALPA to negotiate a CBA with United Air Lines that, despite previous agreements that purported to settle the issue of seniority between pre-strike trainees who did not report for their first day of work because a strike began that day and replacement pilots hired by United during the strike, again shifted the seniority between the two groups. *See Rakestraw v. United Airlines, Inc.,* 981 F.2d 1524 (7th Cir.1992). Noting that "[b]argaining has winners and losers," it was to be expected that ALPA would seek to shore up solidarity by rebuffing management's efforts to divide and conquer the workers by favoring those pilots who were hired during the strike, and therefore the renegotiation of seniority was not a breach of the duty of fair representation. *Id.* at 1532–33. The Court of Appeals held that such action, since it was rationally based on encouraging labor solidarity, could not be deemed arbitrary, nor could it be deemed to have been conducted in bad faith since it was taken for the benefit of the union as a whole. *Id.*

Defendants also rely upon a case involving similar issues of regional jets and carriers, but in that case ALPA solely represented a newly formed MEC for the pilots of four different airlines that were all operated by a single company Eagle (the "Eagle airlines"). *Bishop v. Air Line Pilots Assoc. Int'l,* No. C–98–359 MMC, 159 L.R.R.M. (BNA) 2005, 1998 WL 474076 (N.D.Cal. Aug. 4, 1998), *aff'd,* 211 F.3d 1272, 2000 WL 234520 (9th Cir.2000). Eagle in turn is a subsidiary of AMR Corporation which also owns the mainline carrier American Airlines. *Id.,* 1998 WL 474076, at *1. Pilots at the four Eagle airlines had been represented by three different unions until the NMB ruled that the four airlines were a single transportation system, and that therefore a single representative should be appointed to represent all the pilots of the four Eagle airlines. *Id.*

As the newly formed Eagle MEC (representing all pilots from the four Eagle carriers) began negotiating for a single collective bargaining agreement, Eagle announced plans to introduce regional jets into its fleet. *Id.* at *2. In response, pilots at American (who are *not* represented by ALPA, but by the American Pilots Association ("APA")) went on strike over AMR's

---

*affiliate* will be performed by" Delta pilots, and similarly bars Delta from subcontracting any of its flight operations. (Rosen Decl., Ex. 3, § C.1 (emphasis added).) It misstates the case to argue that by providing a carve-out to

an otherwise flat prohibition on outsourcing, ALPA is therefore actually providing a benefit to Comair pilots rather than just mitigating the harmful effects of the prohibition.

intention to have Eagle pilots fly the regional jets. *Id.* As part of the resolution of the strike, APA and ALPA entered into a Letter of Agreement that limited the size of the regional jets which Eagle pilots would fly but also provided Eagle pilots with priority in hiring at American. *Id.* In the course of negotiating a single collective agreement for all Eagle pilots (eventually ratified by over 60% of all Eagle pilots), ALPA and the Eagle MEC modified their contract ratification procedures and created provisions that could have (but in fact did not because of the ratification by the overall majority) favored pilots of only those carriers that ratified the agreement. *Id.* at *12–15. The court found that ALPA's actions could not have violated the duty of fair representation, *id.*, and even if it had breached any duty, no harm ensued since plaintiffs could not show that the rank and file vote would have rejected the agreement under other circumstances or that Eagle itself would have acceded to other demands. *Id.* at *17. Since the restrictions placed on regional jets were accepted by the Eagle pilots, that case is simply not analogous to the present facts.

An exemplary case from the second category on which Defendants rely bears some factual semblance to the present case, but also reveals why the analogy is inapt. In *Nellis v. Air Line Pilots Assoc.*, 815 F.Supp. 1522 (E.D.Va.1993), *aff'd*, 15 F.3d 50 (4th Cir.1994), former pilots of Eastern Airlines sued ALPA for repeatedly modifying its policies regarding placing the pilots at other airlines as Eastern Airlines went through bankruptcy, so that in the end ALPA failed to obtain lateral seniority for the former Eastern pilots. *See id.*, 815 F.Supp. at 1525–29. The district court found that ALPA could not have

breached its duties to the Eastern pilots since it was neither irrational nor in bad faith for ALPA to decline to advocate vigorously for the sole benefit of the Eastern pilots to the detriment of the existing seniority of ALPA members at other airlines. *Id.* at 1531–32.

Although *Nellis* certainly stands for the premise that a union that fails to secure equal rights at other airlines for its members whose carriers cease operating despite previous assurances that such rights would be sought does not breach its duty of fair representation, its holding is somewhat inapposite to the facts alleged here. Here, Comair is not bankrupt or extinct, but rather an allegedly successful, ongoing concern. As such, ALPA is not allegedly failing to place Comair pilots at equivalent positions at Delta to the detriment of the Delta pilots. Instead, ALPA allegedly has executed agreements to the detriment of Comair pilots' economic opportunities, raising the possibility that Delta would cause Comair to furlough some pilots even if Comair is otherwise financially sound.[10]

Finally, it is worth taking careful note of one other case that neither party mentions. In *Akins v. ICI Americas,* 151 L.R.R.M. (BNA) 2688, 1993 WL 832408 (M.D.Tenn.1993), Local 912 of the International Union of Operating Engineers originally represented workers at two plants, a phosphorus factory known as the "furnace plant" and an herbicide factory known as the "organic plant," both of which were owned by Stauffer Chemical Company in the same city. *Id.* at *1. In 1982, under pressure from management at both factories Local 912 agreed to separate the two plants into separate bargaining units, but subject to clauses in both CBA's that in the event of lay-offs, employees would be

---

**10.** It must also be noted that *Nellis* was decided on summary judgment, whereas this pres-

ent motion is based on Rule 12(b)(6).

able to "cross-bump" one another on the basis of seniority at either plant. *Id.* at *1–2. In 1985, the cross-bump arrangement was again included in the CBA's at both plants, and again in 1988 despite pressure from new owners of both plants to eliminate the provision. *Id.* at *2. In 1990, the new owners of the furnace plant (R–P Basic) announced that it would likely close the furnace plant and begin layoffs in February 1991, which was only five months before the CBA governing employment relations at the organic plant would end. *Id.* at *3. (In truth, layoffs did not occur until July 1991. *Id.*). The Business Manager of Local 912 assured furnace plant workers that there was nothing the organic plant owners could do that would affect their right to transfer under the cross-bumping agreement, but when the organic plant renegotiated its CBA, both Local 912 and the owner deleted all references to the cross-bumping agreement. *Id.*

The district court focused on the fact that Local 912 acted on behalf of the organic plant workers only and not on behalf of its other members at the furnace plant in rejecting the union's defense based upon cases like *Humphrey:*

> Local 912 has attempted to characterize the plaintiffs' situation as being like the one that the Supreme Court described in *Humphrey v. Moore, supra,* that is, that the plaintiffs are merely dissatisfied because their union chose a course of action that favored other union members. However, neither *Humphrey v. Moore* nor the other cases on which the defendants rely, *e.g., Ackley v. Local Union 337, Int'l Bhd. of Teamsters,* 948 F.2d 267 (6th Cir.1991), are apposite.
>
> In all of those cases, the union defendant acted in a manner which favored some members of *the same bargaining unit* over other members of *that bar-*

*gaining unit.* In the instant case, however, Local 912 failed to act in the interest of any members of the furnace plant bargaining unit. Rather, it acted solely for the benefit of the organic plant bargaining unit, to the absolute detriment of the furnace plant bargaining unit. Local 912's actions were not a compromise between competing members of the same bargaining unit; they were a complete sellout of an entire bargaining unit. The Supreme Court has carefully worded its opinions in a way that distinguishes the right of a union to favor certain members within a bargaining unit from the favoring of one bargaining unit over another. In *Humphrey,* for example, the Court said: "A wide range of reasonableness must be allowed a statutory bargaining representative in serving *the unit* it represents." 375 U.S. at 349, 84 S.Ct. at 372, 11 L.Ed.2d at 382 (emphasis added). *See also Air Line Pilots Assoc. v. O'Neill,* 499 U.S. at [76], 111 S.Ct. at 1134, 113 L.Ed.2d at 63 ("the exclusive agent's statutory obligation to serve the interests of all members *of a designated unit* includes a statutory obligation to serve the interests of all members without hostility . . .") (emphasis added) (quoting *Vaca,* 386 U.S. at 177, 87 S.Ct. at 910, 17 L.Ed.2d at 850); *Ford Motor Co. v. Huffman,* 345 U.S. at 337, 73 S.Ct. at 686, 97 L.Ed. at 1057 ("[labor unions'] statutory obligation to represent all members *of an appropriate unit* requires them to make an honest effort to serve the interests of all those members") (emphasis added). This distinction is proper, for it takes into account the fact that members of different bargaining units generally have no say in how another bargaining unit acts, even if the other unit is represented by the same union. By contrast, when a single bargaining unit is faced with a choice

that may favor one faction within the unit, the unit's internal political processes will work to decide the best course of action through discussion among all of the unit's members and, in most cases, a majority vote. The union, as the bargaining unit's exclusive representative, may then carry out the collective desires of the unit's membership.

By deleting the cross-bumping agreement from the organic plant collective bargaining agreement, Local 912 greatly increased the risk that the plaintiffs would not succeed in transferring to the organic plant. *In return for this sacrifice, members of the furnace plant bargaining unit got nothing* (except the pleasure of knowing that their union had negotiated a good contract for another group of employees it happened to represent). From the perspective of members of the furnace plant bargaining unit, Local 912's deleting the cross-bumping agreement from the organic plant bargaining agreement was completely arbitrary. Thus a jury could find that it constituted a breach of Local 912's duty of fair representation.

*Id.* at *14 (last emphasis supplied). Based on these facts, the court denied the union's motion for summary judgment.[11]

 To summarize the lessons this Court can take from precedent, it would appear that ALPA would not breach its duty of fair representation if it were to fail to negotiate provisions in the Delta CBA that benefitted Comair pilots being hired by Delta, *see Nellis, supra*, or if it negotiated seniority provisions that sought to enhance the seniority of certain pilots over others in order to promote labor solidarity,

*see Rakestraw, supra*, nor would it breach that duty if the Delta and Comair pilots were represented jointly in a single bargaining unit that resulted in a contract that could potentially but in fact does not provide certain benefits solely for Delta pilots. *See Bishop, supra.* However, where a union negotiates a contract on behalf of one bargaining unit that explicitly deprives members of other bargaining units of specific rights previously guaranteed, then that action may constitute a breach of the duty of fair representation. *See Akins, supra.* Similarly, if the union seeks to cut off a subcontractor's supply of work by eliminating outsourcing, that action may violate the duty of fair representation if the union also represents employees at the subcontractor. *See Customized Transport, supra.*

The facts alleged in this case fall somewhere short of the facts in *Akins* or the fears raised in *Customized Transport*, since there are no allegations that the Delta CBA will wholly eliminate Comair or lead to permanent unemployment for the Comair pilots. Nonetheless, plaintiffs do allege that ALPA's actions will cause significant harm. Given the allegations, the Complaint states a claim similar to that stated in *Akins* (and noted in *Customized Transport*). To the extent that Defendants had a rational basis for taking the actions they did, or lacked a discriminatory or bad faith motive, plaintiffs' claims and such defenses can be heard on the merits after discovery.

## IV. Preemption of the State Law Claims

 Claims II and III are both state law claims alleging that the same conduct

---

11. After trial, the district court granted judgment as a matter of law for the defendants (including the union). *See Akins v. Zeneca, Inc.,* 62 F.3d 1417, 1995 WL 452087 (6th Cir.1995). In an unpublished decision, the Sixth Circuit affirmed the judgment but declined to review the duty of fair representation claims against Local 912 because plaintiffs had waived that claim on appeal. *Id.,* 62 F.3d 1417, 1995 WL 452087, at *5, n. 3.

that constitutes a breach of the duty of fair representation is also a breach of ALPA's constitution and a breach of defendants' fiduciary duties.[12]

■ A union's authority to represent its members in collective bargaining and its duty of fair representation of those members are created and defined by federal law, and the duty of fair representation has some preemptive effect on substantive state law. *See Vaca,* 386 U.S. at 177, 87 S.Ct. 903 (complaint based on the duty of fair representation "alleged a breach by the Union of a duty grounded in federal statutes, and . . . federal law therefore governs [the] cause of action."); *Peterson v. Air Line Pilots Ass'n Int'l,* 759 F.2d 1161, 1170 (4th Cir.1985) ("The importance of the federal interest is such that the duty of fair representation cause of action is governed exclusively by federal law"). Of course, not every state law claim relating to the union-member relationship would be preempted. *See, e.g., Farmer v. United B'hood of Carpenters & Joiners of Amer.,* 430 U.S. 290, 302, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (intentional infliction of emotion distress claims against union and its officials were not preempted under National Labor Relations Act). Rather, federal labor law does not preempt a state law claim only where the state has a substantial interest in regulation of the conduct at issue and its interest is one that does not threaten undue interference with federal regulation of the same conduct. *Id.*

In the present case, however, it is clear that both the breach of contract and the fiduciary duty claims are necessarily duplicative of and preempted by the duty of fair representation claim. Even if a state has substantial interest in regulating the bargaining process between interstate airline carriers and the unions that represent their employees, it would certainly threaten undue interference with the union's duties to permit the different laws of fifty states to impose different duties upon them in this context. "Duties of this nature would conflict with, rather than supplement, the federal duty of fair representation." *Nellis v. Air Line Pilots Ass'n,* 805 F.Supp. 355, 360 (E.D.Va.1992). Accordingly, the motion to dismiss the state law claims is granted.[13]

## V. Failure to Process Plaintiffs' Grievances or Convene a Hearing Board

■ Plaintiff's Claims IV through IX allege that the defendants breached their duty of fair representation and thus are subject to money damages for failing to process their grievances or to convene a hearing board. It is well established that a union "may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," but it also true that an employee does not have "an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." *Vaca,* 386 U.S. at 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Plaintiffs filed grievances related to the Delta CBA and other issues with ALPA by letters dated January 8, 2001. Plaintiffs allege that to date

---

12. Plaintiffs do not suggest in their Complaint or in their opposition papers that the breach of contract and fiduciary duty claims are governed by federal common law. Defendants note that under federal law, the fiduciary duty claims pursuant to § 411 of the LMRDA are limited solely to misappropriated funds. *See Gurton v. Arons,* 339 F.2d 371, 375 (2d Cir. 1964).

13. The same analysis would apply to the other state law claims regarding the grievance procedure, Claims V and VI, and the Hearing Boards, VIII and IX. However, as seen below, the grievance and Hearing Board claims fail to state any claim and are dismissed on that basis as well.

ALPA has taken no action with regard to the grievances.

However, Jerry Mugerditchian, ALPA's vice-president and secretary, in fact did respond to these grievances by a letter dated January 23, 2001. (*See* Rosen Dec., Ex. 8.) [14] Mugerditchian stated that pursuant to a 1971 decision by the ALPA Executive Board, a hearing board convened under Article VIII, Section 2 of the ALPA Constitution and By–Laws (a section entitled "Grievance Procedure") may only hear cases regarding internal union disciplinary charges against a member. (*Id.*) Article VIII, Section 2 of ALPA's Constitution and By–Laws states in relevant part: "Any member or group of members on an airline having a dispute with the Association concerning interpretation of the Constitution and By–Laws or interpretation of policies adopted by the Board of Directors, *as outlined in Section 1A of this Article,* has the same right of hearing . . . ." (*Id.,* Ex. 1 at 59.) Section 1A identifies the bases for which a member may be disciplined. (*Id.*) Since the grievances do not involve disciplinary charges, Mugerditchian informed plaintiffs that a Hearing Board would lack jurisdiction over the grievances and therefore stated that none would be convened. (*Id.,* Ex. 8.)

In response, plaintiffs argue that Mugerditchian's letter states on its face that it was responding to correspondence dated January 17, 2001, and that therefore it could not have been a response to the grievances dated January 8, and that the attached 1971 decision refers to Article VII and not to Article VIII. The latter argument is without merit, since the text of the decision makes clear that it is referring to the same grievance procedure whose placement within ALPA's Constitution shifted by one Article over the last thirty years. (*Id.* at 2–3.)

At oral argument counsel for plaintiffs argued that discovery was necessary to determine whether Mugerditchian's letter was in fact responding to the correct grievance. Defendants subsequently submitted a letter and a supplemental affidavit that included as an exhibit the January 17 letter, which on its face reveals that it is merely a cover letter from plaintiff Ford to Mugerditchian forwarding the grievances dated January 8th.[15]

Plaintiff Ford subsequently confirmed that the January 17 letter was a cover letter enclosing the grievances. Ford explained that in December 2000 he submitted draft copies of the grievance to persons at ALPA and did not hear that there would be any problem in processing the grievance. (Declaration of Daniel Ford dated Feb. 18, 2003, ¶ 1.) On January 8, 2001, he submitted the actual grievances, and soon received two phone calls from Terry Saturday, the ALPA contract administrator at Comair. (*Id.,* ¶ 2.) Saturday asked Ford to communicate with Mu-

---

**14.** Although these letters (and indeed the original grievances) were not explicitly included in the complaint, the Court can take notice of them on a motion to dismiss since they are integral to these claims in the complaint, *see Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995), and since plaintiffs' claims inherently rely upon Mugerditchian's refusal to process the grievances, *see Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

**15.** Plaintiffs also object to the implication in Defendants' letter brief that the *only* issue requiring discovery in this case was the confusion over the response to the grievances. (See Pl. Letter Brief dated Feb. 19, 2003, at 2.) However, Defendants refer merely to the fact that at oral argument plaintiff clearly indicated that there was confusion over whether Mugerditchian's letter was a response to the grievances, and that the missing cover letter dated January 17, 2001, would fill in the gaps with regard to this issue.

gerditchian about using the Article VIII provisions regarding grievances, and so Ford drafted the letter dated January 17, 2001, enclosing the four grievances. (*Id.*, ¶ 4.) In the face of these documents, which plaintiffs clearly had and relied upon in drafting these claims, plaintiffs are incorrect that Mugerditchian's letter was not a response to their grievances—albeit a response that stated the grievances fell outside of ALPA's formal grievance process and therefore no internal remedy was available.

Plaintiffs then argue that at least two of the four grievances did not even request hearing boards and could not be based upon the provisions of the ALPA Constitution and By–Laws authorizing the use of hearing boards. (*See id.* ¶ 4; Pl. Mem. at 39.) This argument is directly contradicted by the text of the grievance letters dated January 8, each of which stated that plaintiffs were "formally submitting this grievance and requesting that an investigation and *hearing be conducted.*" (Rosen Dec., Ex. 7, at 1–4 (emphasis added).) Plaintiffs also complain that ALPA led them unwittingly into narrowing the grievance as a Section VIII claim so that ALPA could raise this type of summary defense to even processing the grievance. (*See, e.g.*, Pl. Letter Brief at 1; Ford Dec., ¶ 7.) Plaintiffs do not point, however, to any other provision that would entitle them to submit a grievance or to any other rule that would require ALPA to process a grievance for which the union's by-laws do not provide an internal remedy. Accordingly, this argument must be rejected.

Plaintiffs further argue that ALPA should have treated the grievance as charges filed against ALPA officers for purported violations of Article VIII, Section 1A (9) (interference with collective bargaining) and (10) (acting contrary to the best interests of ALPA or its members). However, none of the grievances identify any ALPA officers that may have violated those provisions, nor do the grievances give any reason to believe that these provisions are being violated. (*See* Rosen Dec., Ex. 7.) Further, Section I.C. of Article VIII specifically provides that ALPA's national officers cannot be charged with violations of Article VIII but are only subject to the recall provisions set forth elsewhere in the ALPA Constitution and By-Laws. (*Id.*, Ex. 1, at 59.)

■ Therefore, the question is whether plaintiffs can state a claim for ALPA's refusal to process the grievances where ALPA relied upon its 1971 interpretation of its internal complaint procedure. A union's long standing interpretation of its own constitution is entitled to great deference. *See Dunn v. ALPA*, 193 F.3d 1185, 1197 (11th Cir.1999) (holding that Board's consistent interpretation of ALPA's strike policy over thirty years entitled to substantial deference); *Sim v. New York Mailers' Union No. 6*, 166 F.3d 465, 470 (2d Cir.1999) ("a Union's interpretation of its own constitution is entitled to great deference ... unless patently unreasonable") (internal quotations omitted); *Spellacy v. ALPA*, 156 F.3d 120, 127 (2d Cir. 1998) ("our inquiry is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the pilots' claim in light of the language contained in the collective bargaining agreement"). Given that ALPA's interpretation of its grievance process is worthy of deference and not patently unreasonable, plaintiffs cannot state a claim for failing to process the grievance or for failing to convene a hearing board. Moreover, it is hard to fathom how plaintiffs were harmed since they can (and do) pursue the merits of the grievances directly in this Court without being required to

exhaust any internal union review or appeals.

Accordingly, Claims IV through IX are dismissed.

## VI. The LMRDA Claim

Finally, plaintiffs allege in their tenth claim for relief that defendants have deprived plaintiffs of their equal rights guaranteed under section 411 of the Labor Management Reporting and Disclosure Act ("LMRDA"). Plaintiff presumably refers to Section 411 of Title 29 of the United States Code, which is Section 101 of the LMRDA, Section 101 of the LMRDA provides in relevant part:

> (a)(1) Equal rights. Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1). This statute is often called the union members' "Bill of Rights." *Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 536, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). Plaintiffs allege that these equal rights are violated because ALPA excludes them from participating in deliberations regarding the Delta CBA that directly effect the Comair pilots.

In their motion to dismiss, Defendants argue that plaintiffs fail to allege that they are treated differently from other union members who are similarly situated. Plaintiffs offer no argument opposing

dismissal of the LMRDA claim. Defendants are correct that the LMRDA does not requires a union to extend to members of one bargaining unit the right to participate in the deliberations and vote on the matters before another bargaining unit, even when the second unit's actions might affect the rights of members in the first unit. *See Marshall v. Local Union No. 6, Brewers & Maltsters & Gen. Labor Dep'ts*, 960 F.2d 1360, 1368–69 (8th Cir.1992) ("Local 6 properly excluded the yeast workers, non-members of the brewery workers' collective bargaining unit, from voting on the brewery workers' collective bargaining agreement."); *Akins, supra*, 1993 WL 832408, at *17 ("Other union members, even though they may be affected by the agreement, have no Section 101 right to participate in negotiations or vote on the proposal.").

Accordingly, the motion to dismiss is granted as to the Tenth Claim for Relief.

## VII. Plaintiff's Motion to Amend the Complaint

Pursuant to Rule 15 and 21 of the Federal Rules of Civil Procedure, Plaintiffs seek leave to amend the complaint to add over 300 other Comair pilots as plaintiffs.[16] Rule 21 grants the court "broad discretion to permit a change in the parties at any stage of a litigation." *See Int'l Union of Bricklayers & Allied Craftsmen Local No. 5 v. Hudson Valley Dist. Council Bricklayers & Allied Craftsmen Joint Ben. Funds*, 162 F.R.D. 17, 24 (S.D.N.Y.1995). The court's decision to permit joinder is based on whether the claims of the additional plaintiffs arose out of the same or separate acts or occurrences, whether the party seeking joinder has unnecessarily delayed the proceedings,

---

**16.** The additional plaintiffs would also have a plausible basis to intervene in this action pursuant to Rule 24.

and whether the nonmovant would be prejudiced by the addition. *See Four Star Capital Corp. v. Nynex Corp.,* 183 F.R.D. 91, 98 (S.D.N.Y.1997). A court may impose conditions as necessary. 7 Wright, Miller & Kane, Federal Prac. & Procedure: Civil 3d § 1688 (2001 and 2002 Supp.). Defendants oppose the motion on the grounds that it would be futile.

Given that the other Comair pilots have the same claims, plaintiffs to date have not unnecessarily delayed the proceedings and defendants do not claim prejudice, there would appear to be no reason not to permit the proposed plaintiffs to appear in the action and join in the duty of fair representation claim.

However, the essence of the remedy sought in this case is injunctive relief that would benefit (or harm) all Comair pilots. The efficient administration of judicial resources would suggest that, rather than joining 300 more parties to the action, the parties should consider identifying a suitable class representative (or representatives) for the Comair pilots collectively, and then seek class certification at an appropriate time. The parties are therefore ordered to confer about the propriety of class certification and report to the Court within 30 days from the date of this order whether such a process should be adopted in lieu of joining literally hundreds of other Comair pilots with the identical claim. If either party (or both) does not believe that a class action would be the best method for administering this case, the report should indicate the reasons therefor.

### CONCLUSION

For the foregoing reasons, the motion to dismiss is denied as to Claim I and granted as· to all other claims. The motion to amend the complaint to add new plaintiffs

is stayed pending receipt of the report of the parties regarding class treatment.

SO ORDERED.